775 So.2d 857 (1999)
Robert Bryant MELSON
v.
STATE.
CR-95-1681.
Court of Criminal Appeals of Alabama.
March 26, 1999.
Rehearing Denied May 28, 1999.
*863 Lajuana Sharonne Davis, Montgomery, for appellant.
Bill Pryor, atty. gen., and Paul H. Blackwell, Jr., asst. atty. gen., for appellee.
LONG, Presiding Judge.
The appellant, Robert Bryant Melson, was convicted of three counts of murder made capital because the killings were committed during the course of a robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975; one count of murder made capital because it involved the murder of two or more persons by one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala.Code 1975; one count of attempted murder, see §§ 13A-6-2 and 13A-4-2, Ala.Code 1975; and one count of robbery in the first degree, see § 13A-8-41, Ala.Code 1975. The jury recommended, by a vote of 10-2, that Melson be sentenced to death for his three convictions for the capital offense of murder during the course of a robbery. The trial court accepted the jury's recommendation and sentenced Melson to death by electrocution. The trial court additionally sentenced Melson to life imprisonment without the possibility of parole for his capital conviction for the murder of two or more persons; to 40 years' imprisonment for his conviction for attempted murder; and to *864 40 years' imprisonment for his conviction for robbery in the first degree.
The state's evidence showed the following. At approximately 12:00 a.m. on April 16, 1994, four employees of Popeye's restaurant in Gadsden were closing the restaurant. The restaurant had closed to the public at 11:00 p.m. One of the employees, 17-year-old Bryant Archer, testified that he was helping his coworker, 17-year-old James Nathaniel Baker, take out the trash. Archer testified that the back door to the restaurant was locked, and that another coworker, 23-year-old Darryl Collier, unlocked the door for them. When they opened the door, a black male and a Hispanic male entered and ordered Archer, Baker, Collier, and 18-year-old Tamika Collins, another employee at the restaurant, into the restaurant's office. The two men ordered the employees, at gunpoint, to remove the money from the restaurant's safe. They complied, and were then ordered by the black male to get inside the restaurant's freezer. Shortly after they were locked inside the freezer, the black male opened the freezer door and began shooting. Baker, Collier, and Collins all suffered close-range gunshot wounds to the head, and were dead when paramedics arrived at the scene. Although Archer suffered four gunshot wounds, he survived and was able to crawl from the freezer to the restaurant's office and telephone 911 for help.
When the police arrived at the restaurant, Archer was able to identify one of the men as Cuhuatemoc Peraita, a former employee at Popeye's.[1] Archer told officers from the Gadsden Police Department that the other man was a black male, but that he was unable to identify Melson because both men were wearing bandannas over their faces. Archer was able to identify Peraita by his distinctive hairstyle. Archer further told the police that the black man ordered him and his coworkers into the freezer at gunpoint and locked them inside. According to Archer, the black man then opened the freezer door and began shooting. Archer also told the police that although he did not see the car that the men were driving, he knew that Peraita drove an older model black Chevrolet Monte Carlo.
After the police had gotten Archer's description of the suspects and of the type of car they might be driving, a BOLO ("be on the lookout") was issued at 12:36 a.m. for a black male and a Hispanic male driving an older model black Monte Carlo. Officer Terry Graham of the Rainbow City Police Department received the BOLO and recognized Archer's description of the suspects as people that he knew. Graham then went to Peraita's house, and he saw an older model black Monte Carlo parked in front of the house. Graham also noticed some activity inside Peraita's house. When the Monte Carlo left Peraita's house, Graham followed the car and eventually pulled the car over. Graham testified that Melson was driving the car and Peraita was in the front passenger's seat. Both Melson and Peraita were taken into custody at 1:20 a.m., just a little over an hour after the robbery and murders. They were then transported to the Gadsden Police Department for questioning.
During his questioning, Melson maintained that he and Peraita had been together all night on the evening of April 15, 1994, and that they were separated only when they were pulled over by the police and arrested at 1:20 a.m. on April 16, 1994. Melson told the police that they had been driving around smoking marijuana and that they had driven by Popeye's several times that evening, but they had never gone inside the restaurant. Melson further told the police that he and Peraita had gotten their clothes wet that evening and that they had gone to Peraita's house to change clothes.
*865 On April 18, 1994, two days after he gave his initial statement to the police, Melson asked to speak again to the investigating officer. Melson gave a second statement at that time in which he stated that Peraita had picked him up at 4:00 p.m. on April 15, 1994, and that the two of them had driven around in Peraita's car most of the evening, smoking and selling marijuana. Melson said that at approximately 11:50 p.m., Peraita told him that he was going to visit his girlfriend, who worked at Popeye's. Melson stated that he then asked Peraita for a ride to "Green Pastures." Melson further stated that he walked around "Green Pastures" until about 1:00 a.m., when Peraita picked him up again. Melson said that Peraita asked him to drive, and that he (Melson) saw the police cars and ambulances at Popeye's. According to Melson, Peraita tried to tell him what he had done, but Melson said that he did not want to know. Melson said that he and Peraita then went to Peraita's house to change their clothes because it had been raining that night and their clothes had gotten wet.
Laura Laverty testified that Melson had spent the night of April 14, 1994, with her, and that he had spent most of the day of April 15 with her as well. She testified that Melson left her house with Peraita at approximately 4:30 p.m. on the afternoon of April 15, 1994. She said that Melson and Peraita returned at approximately 11:00 p.m. that evening, and that they stayed at her house for 30 minutes. Although Melson told Laverty that he was coming back, he did not return. Laverty also testified that Peraita had told her, two weeks before the murder, that he was thinking about robbing Popeye's. Laverty testified that Peraita had also stolen a gun several weeks before the robbery and murders at Popeye's.
Laverty further testified that she had visited Melson in jail on a regular basis for about a month after his arrest. Laverty said that Melson had asked her to talk to a girl named Melissa and a guy named "Big Dirt," to see if they would go to Melson's lawyers and tell them that they had seen Melson somewhere else when the robbery and murders were alleged to have occurred. Laverty testified that when Melson left her house at 11:30 p.m. on April 15, 1994, he was wearing a University of Alabama sweatshirt, blue jeans, tennis shoes, and a hat.
Melissa King testified that she and Melson had dated for several months before the robbery and murders at Popeye's, and that they had broken up in February 1994. She further testified that Melson had written her three letters from jail since his arrest in April, asking her to go to the police and to his lawyers, and to provide him with an alibi on the night of the robbery at Popeye's. King refused to do so, and she took the letters to the police.
Evidence presented by the state linking Melson to the murders included testimony concerning items found during a search of Peraita's house. Inside Peraita's house the police found a bag filled with money; an Alabama sweatshirt; two pairs of blue jeans; one pair of tennis shoes; and one green bandanna. In Peraita's front yard, the police found six shell casings. These casings were positively identified as having been fired from the murder weapon, which had been recovered after the murders from the Coosa River.
John Case of the Alabama Department of Forensic Sciences testified that he had compared a set of plaster casts made from shoeprints that were found several days after the murders in a ditch behind Popeye's, to the tennis shoes Melson was wearing when he was arrested. Case testified that in one of those plaster casts, he found imprints of two pebbles and a seed that were imbedded in the tread of the shoe that left the shoeprint. When comparing that plaster cast to Melson's left tennis shoe, Case concluded that, in his opinion, "to find by chance another shoe that would be the same size, the same brand, and have the same degree of wear or lack of wear and also have those inclusions *866 in the same spot on the same shoe and on the cast would be very remote such as to make it impractical to consider another shoe." (R. 1637.)
On appeal from his convictions, Melson raises 17 issues, many of which he did not raise by objection in the trial court. Because Melson was sentenced to death, his failure to object at trial does not bar our review of these issues, see Rule 45A, Ala.R.App.P.; however, it does weigh against Melson as to any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
This court has recognized that "`the plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)). Accordingly, we will address the issues Melson raises on appeal.

GUILT-PHASE ISSUES

I.
Melson contends that there was a fatal variance between the indictment and the proof presented at trial. (Issue XVI in Melson's brief to this court.) In his brief to this court, Melson specifically refers to Counts I, II, and III of the indictment, which charged him with the capital offense of the murders of Darrell Collier, James Nathaniel Baker, and Tamika Collins, respectively, during the course of a robbery in the first degree, and to Count VI of the indictment, which charged him with robbery in the first degree of the surviving victim, Bryant Archer. Melson contends that the state failed to prove that the money stolen during the robbery belonged to the victims. This claim is presented for the first time on appeal; therefore, we will review it pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
The evidence presented at trial showed that all four victims were employees of Popeye's restaurant and were working at the restaurant on the night of the robbery. Archer testified that it was the responsibility of the employees on duty to keep up with the money in the restaurant. Archer further testified that he and his three coworkers were ordered at gunpoint into the restaurant's office. Once inside the office, the men ordered Darrell Collier to open the safe. The men then took the cash and coins in the safe and put them into a bag. The employees were then forced into the freezer at gunpoint by Melson. Within seconds after ordering them into the freezer, Melson shot the victims.
This court has previously held that:
"`In an indictment charging robbery the ownership of stolen property is properly laid in the party in possession, either as owner conditional, or bailee, or agent.... The indictment need not aver that the person robbed was lawfully in possession or the legal custodian of the property stolen.... There is no material variance between an indictment which charges that the property taken was the personal property of a named individual and proof showing that the *867 property belonged to another or to a corporation.'"
Naismith v. State, 615 So.2d 1323, 1324-25 (Ala.Cr.App.1993), quoting Hobbie v. State, 365 So.2d 685, 686 (Ala.Cr.App.1978); see also Williams v. State, 568 So.2d 354, 357 (Ala.Cr.App.1990) (to establish a prima facie case of robbery there is no requirement that the property stolen belonged to the robbery victim and there is no material variance between an indictment charging that the property taken belonged to a named individual and proof showing that the property belonged to another); Williams v. State, 546 So.2d 705, 708 (Ala. Cr.App.1989) ("For purposes of robbery, the `owner' is the person in possession of the property.").
"[A]s long as the offense is described with sufficient certainty to identify the act of robbery and to establish that the property was in the immediate actual possession of the person against whom force was used," there is no material variance between an indictment alleging that the property was stolen from an employee of a business and proof that the property was owned by the business. See Ex parte Hamm, 564 So.2d 469, 471 (Ala.), cert. denied, 498 U.S. 1008, 111 S.Ct. 572, 112 L.Ed.2d 579 (1990). The indictment in this case clearly informed Melson of the offenses with which he was being charged. Thus, we find no error, plain or otherwise, here. 564 So.2d at 471.
We additionally note that § 13A-5-40(a)(2), Ala.Code 1975, proscribes an attempted robbery as well as a completed theft; therefore, even if there had been no proof at trial that Melson had actually stolen any property from the victims, his capital convictions for murder committed during a robbery in the first degree would still be proper. See Johnson v. State, 473 So.2d 607, 611 (Ala.Cr.App.1985). Because the present robbery statutes do not require a "taking" of property, the indictment need not even allege an actual theft to constitute the offense. Gainey v. State, 647 So.2d 37, 38 (Ala.Cr.App.1994).

II.
Melson also contends that the trial court erred in denying his motion for a change of venue based on excessive pretrial publicity because, he says, the extensive publicity surrounding his case made it impossible for him to receive a fair and impartial trial in Etowah County. (Issue XI in Melson's brief to this court.)
The record reflects that Melson filed a motion for a change of venue and attached to the motion as exhibits numerous transcripts of local television and radio news reports and newspaper articles that were broadcast and published in Etowah County during the two years between Melson's arrest in April 1994 and his trial in April 1996. The transcripts and the articles primarily detailed the facts of the murders and robbery at the Popeye restaurant, reported on Melson's codefendant's trial, which occurred approximately one year before Melson's trial, and detailed the criminal charges pending against Melson at the time of the murders, and of which he was subsequently convicted before his trial in the present case.
At the hearing on Melson's motion, Melson presented the testimony of individuals from various radio and television stations who testified concerning the extent of the coverage given by their stations to the murders and robbery at Popeye's. At the conclusion of the hearing, the trial court stated that it would wait until after the voir dire of the jury venire to rule on the motion so that it could determine what effect, if any, the pretrial publicity had on the prospective jurors. (R. 115.)
In denying Melson's motion for a change of venue, the trial court stated:
"Of course, the Court waited until now to decide this case because I agree with counsel there is no doubt that this case and the other case [Melson's codefendant's case] probably has had as much publicity as far as this county is concerned *868 of any prior capital case that has ever
". . . .
"Since Holladayand going back to the Gilbert Beck case, which I had some experience with. But after listening to juror after juror who were very ably examined by counsel about what they remembered about his case, I didn't get an inkling out of the vast majority of those questions that they remembered enough information that would affect their judgment to be impartial jurors. Without a doubt if there had been a mass response by these jurors that theythat the exposure to the media would have some bearing or effect on their ability to be a juror on this case, then I was ready to move it, but I didn't see that. I really didn't see that, and I was a little bit surprised about it. I feel, you know, with the numberwe started out with 150 and we carefully scrutinized every excuse that each juror might have had and we have spent considerable time questioning them about the publicity and that sort of thing and I think we are down to 53 folks who can be fair. I feel comfortable with that. I don't have any misgivings at all. I believe that we can get a fair trial here with that many folks who expressed to this Court and to y'all that they could be fair.
"[The prosecutor]: Your Honor, I would like also for the record to reflect that a lot of these folks who were excused out of the 150, it was for mattersa lot of them were for matters that didn't have anything to do with any publicity. As a matter of fact, there has been very few.
"The Court: That's on the record. That is protected for future reference.
". . . .
"The Court: The Court finds that there is a sufficient number of jurors to have a fair trial here. So I'm denying your motion for change of venue unless something comes up between now and the time we start the trial that would change my mind we will go forward...."
(R. 1081-83.)
When reviewing the correctness of a trial court's ruling on a motion for a change of venue, we must determine whether the trial court abused its discretion.
"`The determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial.'

"Nelson v. State, 440 So.2d 1130, 1132 (Ala.Cr.App.1983). See also Trahan v. State, 450 So.2d 1102 (Ala.Cr.App.1984). An appellant must prove a `gross abuse of discretion' before the trial court's ruling on a motion for change of venue will be reversed on appeal. Anderson v. State, 443 So.2d 1364 (Ala.Cr.App. 1983)."
Hunt v. State, 642 So.2d 999, 1042 (Ala.Cr. App.1993), aff'd, 642 So.2d 1060 (Ala.1994). "A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case." Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App.1994).
In Oryang v. State, 642 So.2d 979 (Ala. Cr.App.1993), we stated the following with regard to the standard a trial court should use in deciding whether to grant a motion for a change of venue based upon pretrial publicity:
"`"`There are two situations in which a change of venue is mandated. The first is when the defendant can show that prejudicial pre-trial publicity "has so saturated the community as to have a probable impact on the prospective jurors" and thus renders the trial setting "inherently suspect." McWilliams v. *869 United States, 394 F.2d 41 (U.S.C.A. 8th Cir.1968); Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). In this situation, a "pattern of deep and bitter prejudice" must exist in the community. Irvin v. Dowd, [366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)] supra.
"`"`The second situation occurs when the defendant shows "a connection between the publicity generated by the news articles, radio and television broadcasts in the existence of actual prejudice." McWilliams v. United States, supra.'

"`"Nelson, 440 So.2d at 1131-32."

"`Thomas v. State, 539 So.2d 375 (Ala. Crim.App.1988). See also Robinson v. State, 430 So.2d 883 (Ala.Crim.App. 1983).'

"Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.1989), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
"Thus, a change of venue must be granted only when it can be shown that the pretrial publicity has so `pervasively saturated' the community as to make the `court proceedings nothing more than a "hollow formality,"' Hart v. State, 612 So.2d 520, 526-27 (Ala.Cr.App.), affirmed, 612 So.2d 536 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993), citing Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963), or when actual prejudice can be demonstrated. The burden of showing this saturation of the community or actual prejudice lies with the appellant. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In order to show community saturation, the appellant must show more than the fact `that a case generates even widespread publicity.' Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992). `"Newspaper articles alone would not necessitate a change of venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945]."' Thompson v. State, supra at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala. Cr.App.), cert. denied, 353 So.2d 35 (Ala. 1977). Furthermore, in order for a defendant to show prejudice, the `"proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination." Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978).' Ex parte Grayson, 479 So.2d 76, 80 (Ala. 1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 188[88] L.Ed.2d 157 (1985)."
642 So.2d at 982-83.
We acknowledge that Melson's case received extensive publicity during the two years between his arrest and his trial. However, "`in order to obtain a change of venue, it must be shown that pre-trial publicity surrounding the case was inherently prejudicial.'" Oryang, 642 So.2d at 983, quoting Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989). We recognize that the "presumptive prejudice" standard is "`rarely' applicable, and is reserved for only `extreme situations.'" Hunt, 642 So.2d at 1043, quoting Coleman v. Kemp, 778 F.2d 1487, 1490 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). We also recognize that Melson's burdento show that pretrial publicity saturated the community so as to deny him a fair trialis a very heavy burden. See Hunt, supra at 1043. "`Prejudicial' publicity usually must consist of much more than stating the charge, and of reportage of the pretrial and trial processes. `Publicity' and `prejudice' are not the same thing. Excess publicity does not automatically or *870 necessarily mean that the publicity was prejudicial." Id.
A review of all of the evidence presented by Melson in support of his motion for a change of venue reveals that most of the reports of the murders and robbery were reasonably factual and objective and, for the most part, were not inflammatory or prejudicial in tone. The newspaper articles and the television and radio news reports do not accuse, nor were they sensational or denunciatory; they primarily reported the details of the offense and developments in the case. We do not find that the pretrial publicity so "pervasively saturated" the community so as to render the court proceedings nothing more than a "hollow formality." Oryang, supra at 983.
Our review of the record reflects that the trial court initially questioned the 150 potential jurors on the jury venire and asked whether any of them had a fixed opinion as to Melson's guilt or innocence that would bias their verdict. Of the 14 jurors who raised their hand, 6 stated, after individual questioning by the attorneys, that their fixed opinion as to Melson's guilt was based on media exposure, and in the instances of some of these six jurors, also on discussions of the murders with family and friends. Some of these six jurors additionally provided the court with other reasons that required their excusal, such as "hardship" excuses, and because they knew the victims and their families. All six of these prospective jurors were removed for cause by the trial court.
The record further reflects that after the excusals of jurors by the trial court, the jury venire consisted of 90 prospective jurors. The trial court then divided the jury venire into seven panels. The prosecutor and Melson's counsel questioned each panel and were allowed to question individually any prospective juror who indicated that he or she had heard or read about Melson's or Peraita's case. Although almost all of the prospective jurors indicated that they had heard about the case through a media report, the majority of these jurors stated that they remembered very little about the case from the report. They also indicated that they could lay aside what they had read or heard about the case and render a fair and impartial verdict based on the evidence. Any juror who, during individual questioning by the attorneys, expressed either a reservation or a fixed opinion about Melson's guilt, or who indicated familiarity with Melson's and Peraita's cases that could possibly affect the juror's ability to be fair, was promptly dismissed by the trial court for cause.
As the Alabama Supreme Court stated in Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985):
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'
"The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, `the proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978)."
479 So.2d at 80. "`"The relevant question is not whether the community remembered the case, but whether the jurors at [the accused's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984).'" Siebert v. *871 State, 562 So.2d 586, 589 (Ala.Cr.App. 1989), aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990), quoting Fortenberry v. State, 545 So.2d 129 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).
The jury venire in this case was extensively and thoroughly examined regarding each prospective juror's knowledge about the case. Melson has failed to show either that the community was saturated with pretrial publicity, or that actual prejudice existed among the jurors at his trial. The record offers no indication that any juror had a fixed opinion of Melson's guilt or that the verdict was not impartially rendered on the evidence presented at trial. Our review convinces us that the trial court did not abuse its discretion in denying Melson's motion for a change of venue.

III.
Melson further contends that the trial court improperly denied his pretrial request for access to the criminal records, if any, of the state's witnesses. (Issue XV in Melson's brief to this court.) He maintains that the trial court's denial of his request violated both his right to impeachment evidence under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and his right to "broadened" discovery under Ex parte Monk, 557 So.2d 832 (Ala.1989). (Melson's brief, pp. 59-60.) We find no merit to Melson's claim.
The record reflects, contrary to Melson's assertion in his brief to this court, that the trial court did in fact grant his motions requesting access to the criminal records of the state's witnesses. Specifically, the record shows that the following occurred during a hearing on pretrial motions held on April 1, 1996:
"The Court: All right. The next motion is `Motion to Require the Prosecution to make known any incentives or agreements they have made with any witness who will give testimony in this case and disclose the record of all State witnesses.' I have that as my motion number three, just if y'all are keeping track of how the rulings are going.
". . . .
"[The prosecutor]: With regard to any alleged criminal record of any, I'm not aware of any. I have not run a criminal history on any of them, but most of our witnesses are police officers and investigators or experts with the Department of Forensic Sciences, but I'm not aware of any criminal record that any other witnesses may have. There has not been any brought to my attention.
"[Melson's counsel]: That would address the subsequent motion that has been filed about a criminal record?
"[The prosecutor]: Well, that was in here to disclose
"[Melson's counsel]:That was in the original motion?
"[The prosecutor]: Uh-huh. But I'm not aware of any. If I find out about any that might in any way touch on their credibility or their reputation for truth and veracity, I will make it known to defense counsel when I find out about it, but I'm not aware of any. As far as any of them supposedly on probation, parole, prior convictions, have pending criminal charges, under investigation, I am not aware of any of those.
"The Court: Does that satisfy the defendant's counsel?
"[Melson's counsel]: Judge, I would like the motion granted, but I think he has complied with it.

"The Court: All right.

"[The prosecutor]: Like I say, if there is anything that comes up, you know, that I'm not aware of now if we find out about it
"The Court:Just an ongoing motion, if any further information comes to the *872 attention of the State, they are to promptly report it to defense counsel.
"[The prosecutor]: Yes, sir."
(R. 123-26.) (Emphasis added.)
The record further reflects that Melson filed a similar motion requesting that the prosecution disclose any juvenile and criminal records of the state's witness. This motion was also discussed at the April 1, 1996, hearing:
"The Court:.... 9-A, `Motion to produce the record of all criminal and or juvenile court proceedings involving any prosecuting witness.'
"[Melson's counsel]: Judge, I think that is a duplication of what was in the earlier discovery motion that you granted.
"The Court: Yes. Any problem about that?
"[The prosecutor]: Which one was that, Judge?
"The Court: This motion for you to produce all the criminal records, juvenile and otherwise of any witness.
"[The prosecutor]: I'm not aware of any, but if there are any, I will give them to them.
"The Court: Motion granted.

"[Melson's counsel]: Judge, I think it is important that the motion ask for the Court to order the district attorney to inquire into that and make a diligent effort to find out.
"[The prosecutor]: Well, I don't have time to do that. I'm trying to get this case ready.
"The Court: I don't know if he has got a duty. If he is not planningyou know, if it is not part of his preparation of his case if he has got to go hunt up a record
"[Melson's counsel]: Judge, we don't have access to that. That is information that the State has access to that may be of benefit to us.
"The Court: Well, juvenile court, yes.
"[The prosecutor]: I can't get those anyway.
"The Court: They have got to beIf y'all want something, a juvenile record on any witness
"[The prosecutor]: You have to get that from the Court. I can't get that.
"The Court: I can order it, but I don't think either of y'all can, either the State or the defense. As far as all other criminal records, that is a public record and you have as much access to it as the State would.
"[Melson's counsel]: Judge, we don't have access to the computer system to find out everything that they are able to find out.
"[The prosecutor]: The probation office has that though. And anything I get from [the National Crime Information Center] NCIC [Computer databases] I can't give to you anyway. I am prohibited by law from releasing that information. We can lose our access to it if we do that. I can't do that. I can direct you somewhere to find it, but the only place I'm going to be able to direct you is to the probation office.
"The Court: Well, if you will reframe this motion to order somebody who has got access to the information I will grant it. You know who the witnesses are; right?
"[Melson's counsel]: Yes, sir.
"[The prosecutor]: And we are going to be getting back together again. I will provide you with an update list and the order I expect to call them in and what I think they are going to testify to and any exhibits that I may be putting in also. We will do that in advance of trial."
(R. 148-51.) (Emphasis added.)
It is clear that the trial court did in fact grant Melson's motions, and Melson's counsel stated that he was satisfied with the trial court's ruling. Melson's counsel further stated that he believed that the prosecutor had complied with the requests. *873 Because there is no adverse ruling from which Melson can appeal, we will review this claim pursuant to the plain error rule. Rule 45A, Ala.R.App.P.; see also Barnes v. State, 704 So.2d 487 (Ala.Cr.App.1997); Sheely v. State, 629 So.2d 23 (Ala.Cr.App. 1993).
We have recently stated the following in regard to discovery requests for the criminal records of the state's witnesses:
"There is no absolute right to discovery, including discovery of prior convictions of witnesses or of possible impeachment evidence, in criminal cases. Smith v. State, 639 So.2d 543 (Ala.Cr.App.1993); Bailey v. State, 421 So.2d 1364 (Ala.Cr. App.1982). Rather, the trial court has discretion in determining whether to order discovery of the prior convictions of witnesses or other possible impeachment evidence, and such a decision will not be overturned absent an abuse of discretion. Ross v. State, 555 So.2d 1179 (Ala. Cr.App.1989); Williams v. State, 451 So.2d 411 (Ala.Cr.App.1984); Wright v. State, 424 So.2d 684 (Ala.Cr.App.1982); Mardis v. State, 423 So.2d 331 (Ala.Cr. App.1982)."
Davis v. State, 720 So.2d 1006, 1027 (Ala. Cr.App.1998).
In addition to granting Melson's motions asking for the prosecution to disclose any criminal records of its witnesses that it was aware of, the trial court further provided Melson's counsel with the opportunity to file additional motions, which the trial court said it would grant, requesting juvenile and criminal records from the appropriate persons with access to that information. Counsel filed no additional motions. Melson has not shown that the trial court abused its discretion with regard to its rulings on the motions. We find no evidence that the prosecutor suppressed evidence of any prior convictions of its witnesses. See Davis, 720 So.2d at 1027. Accordingly, we find no error, plain or otherwise, as to this claim.

IV.
Melson asserts that his constitutional rights were violated because he was not present at a pretrial hearing held on October 12, 1994, a year and a half before his trial began. (Issue XIV in Melson's brief to this court.) Acknowledging that the law is contrary to his position, Melson, citing Rule 9.1, Ala.R.Crim.P.,[2] nevertheless argues that a capital defendant cannot waive the right to be present at any stage of the trial. There is no merit to Melson's claim.
The record reflects that Melson's counsel was present at the hearing on pretrial motions, and no objection to Melson's absence was entered. In fact, Melson's counsel stated for the record at the hearing that because the hearing dealt with a motion as to whether Melson should be arraigned that morning, Melson had waived his presence. (R. 3.) Specifically, the record reflects that Melson's counsel filed a pretrial motion styled "Motion To Continue Arraignment" in which he stated that he had not had adequate time to prepare for Melson's arraignment. At the hearing on the motion, the prosecutor, arguing to arraign Melson that morning, stated that he would have no objection to Melson's counsel's reserving the right to file any motions concerning the indictment or any additional pleas after his arraignment. The trial court stated that because the state was willing to leave all matters open concerning the indictment, it saw no reason why Melson could not be arraigned that morning.
The record further reflects that at the hearing, Melson's counsel requested that Melson be arraigned at the jail instead of at the courthouse. Melson's counsel requested that Melson be arraigned at the jail so the media would not be able to *874 photograph Melson being brought from the jail to the courthouse in handcuffs and shackles. The trial court noted that Melson's counsel's concern about the publicity surrounding the case and his request to hold the arraignment at the jail was actually the "thrust" of his argument at the hearing on his motion for a continuance. (R. 7.) The trial court denied Melson's motion to continue his arraignment and his request to be arraigned at the jail. At 11:20 a.m., only 40 minutes after the hearing on Melson's motion to continue the arraignment began, Melson was brought from the jail to the courthouse for arraignment.
We initially point out that Melson, who for clearly stated reasons waived his presence at the pretrial hearing on his motion to continue his arraignment, is presenting this claim for the first time on appeal. "`"A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions."'" Slaton v. State, 680 So.2d 879, 900 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Campbell v. State, 570 So.2d 1276, 1282 (Ala.Cr.App.1990). As we have said in applying the invited-error doctrine, "`It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice.'" Murrell v. State, 377 So.2d 1102, 1105 (Ala.Cr.App.), cert. denied, 377 So.2d 1108 (Ala.1979), quoting Aldridge v. State, 278 Ala. 470, 474, 179 So.2d 51, 54 (1965). "The invited error rule has been applied equally in capital cases and noncapital cases." Rogers v. State, 630 So.2d 78, 84 (Ala.Cr.App.1991), rev'd on other grounds, 630 So.2d 88 (Ala.1992), aff'd. on remand sub nom. Musgrove v. State, 638 So.2d 1347 (Ala.Cr.App.1992), aff'd, 638 So.2d 1360 (Ala.1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).
"An invited error is waived, unless it rises to the level of plain error." Ex parte Bankhead, 585 So.2d 112, 126 (Ala. 1991). Here, we find no error, much less plain error, as to Melson's claim. Rule 45A, Ala.R.App.P.
This court recently stated in Borden v. State, 769 So.2d 935 (Ala.Cr.App.1997):
"`"The court in Proffitt v. Wainwright, [685 F.2d 1227 (11th Cir.1982), cert. denied, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983)], acknowledged in a footnote that in Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), `which was a capital case, [the Court] stated that the sixth amendment privilege of confrontation could "be lost by consent or at times even by misconduct." Snyder v. Massachusetts, 291 U.S. at 106, 54 S.Ct. at 332.' Proffitt v. Wainwright, supra, at 1257, n. 43. See also State v. Davis, 290 N.C. 511, 227 S.E.2d 97, 110 (1976) (`the strict rule that an accused cannot waive his right to be present at every stage of his trial upon an indictment charging a capital felony, State v. Moore, 275 N.C. 198, 166 S.E.2d 652 (1969), is not extended to require his presence at the hearing of a pretrial motion for discovery when he is represented by counsel who consented to his absence, and when no prejudice resulted from his absence'). See also State v. Piland, 58 N.C.App. 95, 293 S.E.2d 278 (1982), appeal dismissed, 306 N.C. 562, 294 S.E.2d 374 (1982) (`[t]he capital defendant in this case has not demonstrated any prejudice to him by his absence from a part of the hearing. The evidence elicited was not disputed and there has been no showing that it would have been different had the defendant been present').
"`"Thus, if the appellant's presence... would have been useless to [his] defense and if the [pre-trial] hearing was not considered to be a `critical stage' of [his] trial, then we can find *875 no error in the appellant's absence from the hearing."`
"[Ponder v. State], 688 So.2d [280,] at 285 [(Ala.Cr.App.1996)], quoting Harris v. State, 632 So.2d 503, 512 (Ala.Cr.App. 1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (emphasis in Harris.) See also Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.), on return to remand, 672 So.2d 1353 (Ala.Cr.App. 1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996); Ex parte DeBruce, 651 So.2d 624 (Ala.1994); Burton v. State, 651 So.2d 641 (Ala.Cr.App. 1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995)."
769 So.2d at 943; see also Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998).
Here, Melson has not demonstrated that he suffered any prejudice as a result of his absence from the pretrial hearing on his motion to continue his arraignment. The motion was filed primarily in an attempt to avoid media attention by having Melson arraigned at the jail instead of at the courthouse. As the state correctly points out in its brief to this court, Melson cannot effectively argue on appeal that his absence from the pretrial hearing deprived him of a fair trial, when at the hearing, he argued that his absence was necessary to ensure him a fair trial. It was obvious at the hearing that Melson's counsel believed that Melson's absence was in Melson's best interest. The pretrial hearing, which lasted only 40 minutes, was not a "critical" stage of the trial. Because Melson has been unable to demonstrate any prejudice to him resulting from his absence from the pretrial hearing on his arraignment, we find no plain error as to this claim.

V.
Melson further asserts that his due process rights were violated when, he says, the prosecutor improperly solicited a promise from prospective jurors, during the voir dire, to impose the death penalty if the state proved the existence of aggravating circumstances. (Issue VII in Melson's brief to this court.) Melson is presenting this claim for the first time on appeal; thus, we will review it pursuant to the plain error rule. Rule 45A, Ala. R.App.P.
The record reflects that during the voir dire, the prosecutor asked each prospective juror whether he or she would have a problem, in the event Melson was found guilty of a capital offense, and further, in the event that the proven aggravating circumstances were found to outweigh the proven mitigating circumstances, recommending that Melson be sentenced to death. (R. 521-22; 594-95; 667; 728; 823; 915-16; 991-92.)
Melson argues that in posing these questions to the prospective jurors, the prosecutor was asking each juror to assure him that he or she would return a verdict of death, even though the juror had not heard any evidence in the case. (Melson's brief, p. 40.) We fail to see how the prosecutor's questions were improper. Nor do we see how they in any way were designed to elicit a promise from the prospective jurors that they would recommend the death penalty.
In addressing a claim similar to Melson's, we stated the following in Ex parte Ford, 515 So.2d 48 (Ala.1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988):
"A party may not solicit a promise to return a particular verdict. Ex parte Dobard, 435 So.2d 1351 (Ala.1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984). In asking this question, the prosecutor was not asking for a commitment or promise from the prospective jurors to vote for the death penalty. He was merely attempting to determine if any of the potential jurors were of a mind-set that would affect their verdict as tending to show bias or *876 interest. The parties have a right, within the sound discretion of the trial court, to do this. Ex parte Ledbetter, 404 So.2d 731 (Ala.1981). Furthermore, questions concerning jurors' attitudes about capital punishment are not limited to those questions that would elicit information constituting grounds of a challenge for cause. Brown v. State, 288 Ala. 684, 264 So.2d 553 (1972); Arthur v. State, 472 So.2d 650 (Ala.Crim.App. 1984); rev'd on other grounds, 472 So.2d 665 (Ala.1985)."
515 So.2d at 52; see also Click v. State, 695 So.2d 209, 221 (Ala.Cr.App.1996), cert. denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997); Grayson v. State, 675 So.2d 516, 522 (Ala.Cr.App.1995), cert. denied, 519 U.S. 934, 117 S.Ct. 309, 136 L.Ed.2d 225 (1996).
The prosecutor's questions in this case sought to identify, for purposes of exercising peremptory strikes, any jurors who could not fulfill their duty by following the law and recommending a death sentence when a defendant is convicted of capital murder and the aggravating circumstances outweigh the mitigating circumstances. See Ex parte Dobard, 435 So.2d 1351, 1356 (Ala.1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984). The prosecutor was not attempting to elicit a promise that the jurors would recommend the death penalty, but was simply trying to discern the prospective jurors' attitudes toward the death penalty.
Our review of the record reveals that during the voir dire examination, Melson's counsel asked four of the seven panels of prospective jurors what counsel referred to as the "other side of the coin" of the prosecutor's question that is now being complained of on appeal. (R. 694.) Melson's counsel asked these prospective jurors whether any of them would have a problem recommending a sentence of life imprisonment without parole if they found that the mitigating circumstances outweighed the aggravating circumstances. (R. 694; 755; 864; 945.) For the same reasons discussed above concerning the prosecutor's question to the prospective jurors, Melson's counsel's question was likewise proper.
Accordingly, we find no error, much less plain error, as to this claim.

VI.
Melson further contends that his arrest was illegal because, he says, the police did not have probable cause to arrest him without an arrest warrant; therefore, he argues, his post-arrest statement to police and certain other evidence[3] were improperly admitted into evidence by the trial court because, he says, they were the "fruits" of an illegal arrest. (Issue II in Melson's brief to this court.) We disagree.
As we stated in Smith v. State, 727 So.2d 147 (Ala.Cr.App.1998), aff'd, 727 So.2d 173 (Ala.1999):
"Section 15-10-3[(a)](3), Ala.Code 1975, provides that an officer may arrest someone without a warrant when he has reasonable cause to believe that the person arrested committed a felony. [See also Rule 4.1(a)(1)(i), Ala.R.Crim.P.] `"Reasonable cause is equated with probable cause.'" Sockwell v. State, 675 So.2d 4 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.1995). `Probable cause is knowledge of circumstances that would lead a reasonable person of ordinary caution, acting impartially, to believe that the person arrested is guilty.' Sockwell, 675 So.2d at 13.
"`Probable cause to arrest exists when, at the time the magistrate issues the warrant or the officer makes the arrest, there are reasonably trustworthy facts and circumstances sufficient, given the totality of the circumstances, to lead a reasonable person to *877 believe there is a fair probability that the suspect is committing or has committed an offense.'
Swain v. State, 504 So.2d 347 (Ala.Cr. App.1986), citing Fifteenth Annual Review of Criminal Procedure; United States Supreme Court and Courts of Appeal 1984-1985, 74 Geo. L.J. 499, 518 (1986). As concerns probable cause, we note that the Alabama Supreme Court has held:
"`Probable cause exists if facts and circumstances known to the arresting officer are sufficient to warrant a person of reasonable caution to believe that the suspect has committed a crime. "In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act...." "`The substance of all the definitions of probable cause is a reasonable ground for belief of guilt.'" "Probable cause to arrest is measured against an objective standard and, if the standard is met, it is unnecessary that the officer subjectively believe that he has a basis for the arrest." The officer need not have enough evidence or information to support a conviction in order to have probable cause for arrest. Only a probability, not a prima facie showing, of criminal activity is the standard of probable cause.'

"Dixon v. State, 588 So.2d 903, 906 (Ala. 1991) (citations omitted).
"In determining whether probable cause for a warrantless arrest exists, this court must examine the totality of the circumstances surrounding the arrest. Sockwell, supra."
727 So.2d at 156-57.
At trial, Officer Wayne Sims of the Gadsden Police Department testified that he was dispatched to Popeye's restaurant at approximately 12:26 a.m. on April 16, 1994, in response to a 911 emergency call to police that there had been a robbery and a shooting at the restaurant. Sims was met at the scene by Officer Billy Vasser, also an officer with the Gadsden Police Department. After going inside the restaurant, Officers Sims and Vasser found Bryant Archer, the surviving victim, and got from him a description of the robbery and shooting suspects. Archer told the officers that one of the men was a Hispanic male whom Archer knew by name because they had worked together at Popeye's. Archer identified the man as Cuhuatemoc Peraita, and he further told the police that Peraita drove an "older model black Monte Carlo." (R. 1214.) Archer described the other man as a black male, whom Archer identified as the man who had pushed him and the other employees into the freezer and who had shot them repeatedly. Sims testified that he relayed the information given to him by Archer on his police radio in the form of a BOLO ("be on the lookout").
Officer Terry Graham of the Rainbow City Police Department testified that while on patrol, at 12:36 a.m. on April 16, 1994, he received a BOLO from the Gadsden Police Department for a late 1970s black Chevrolet Monte Carlo occupied by one black male and one Hispanic male. Graham testified that he recognized the persons and the car allegedly involved in the robbery and shooting, and that he knew where one of the suspects, Peraita, lived. Graham further testified that he, along with several other officers, went to Peraita's house and saw a car matching the description in the BOLO parked in front of the house. Graham also testified that he observed "activity" inside the house. The other officers "staked out" the house, while Graham left to telephone the Gadsden dispatcher to have an officer who was on the scene at Popeye's call him to verify the information contained in the BOLO. Graham testified that he also wanted to check and see if any additional details about the *878 robbery had become available that were not available when the BOLO was issued.[4]
After Graham returned to Peraita's house, two individuals left the house in the black Monte Carlo. The officers followed the car, and eventually pulled it over. Graham testified that the individual in the passenger's seat of the car was a Hispanic male and the driver of the car was a black male. At 1:20 a.m., both suspects were handcuffed and taken into custody by the officers. Graham testified that the suspects remained in the custody of the Rainbow City Police Officers until officers from the Gadsden Police Department arrived a few minutes later.
In his brief to this court, Melson argues that the only facts available to the police officers at the time of his arrest were that he was a black male and that he was with Peraita in Peraita's car when the police stopped them.[5] These facts, Melson claims, were insufficient to support the trial court's finding that the officers had probable cause to arrest Melson. In denying Melson's motion to suppress evidence obtained after his arrest, the trial court stated:
"All right. First on probable cause, I think that the evidence I have heard goes above and beyond probable cause so I am overruling your objection as to that.... I think there is much more than probable cause. I'm comfortable with that...."
(R. 1490.) We agree with the trial court's findings.
At the time of Melson's arrest, the police had the following information concerning the crime: that three people had been brutally murdered and one person seriously injured during a robbery at Popeye's restaurant in Gadsden; that Archer, the surviving victim, had identified one of the robbers as Peraita, an individual whom Archer had worked with at Popeye's; that Archer had identified the other robber as a black male; that, according to Archer, the black male ordered the employees of the restaurant into the freezer and then repeatedly shot them; and that the robber identified by Archer as Peraita drove a 1970s model black Chevrolet Monte Carlo.
The car stopped by the police officers and the car's occupants precisely matched Archer's description of the suspects and the car owned by Peraita. Peraita and Melson were stopped by the police less than an hour after the BOLO had been issued, and only a little over an hour after the robbery and murders had occurred. Although Archer's description of the second robber as being a black male may not have amounted to much by itself, it became significant when considered in conjunction with the other facts and descriptions provided to police by Archer. See Dixon v. State, 588 So.2d 891, 899 (Ala.Cr. App.1990), overruled in unrelated part, 588 So.2d 903 (1991). Melson, a black male, was with Peraita, driving a car matching Archer's description of the car owned by Peraita, shortly after the robbery and murders, and Peraita had been positively identified as one of the robbers; it would be reasonable for a prudent man to believe that Melson had participated in the robbery and was actually the triggerman who had shot and killed three people and had attempted to kill a fourth person. One of the arresting officers had personal knowledge *879 of Peraita and Melson, and recognized that Archer's description of the robbers and of the robbers' car matched that of Peraita and Melson and Peraita's
There was certainly probable cause for the officers to arrest both Peraita and Melson for the robbery and murders at Popeye's. The knowledge that the police had at the time of Melson's arrest made it probable, if not obvious, that the black man Archer described was Melson. The facts known to the police at the time of Melson's arrest were significant and strongly suggested the probability that Melson was one of the assailants. As our caselaw states, at the arrest stage we are dealing only with probabilities, and not the more stringent standard required for a conviction. The probable cause standard does not require an arresting officer to rule out all other possible suspects before he or she detains a particular individual. See State v. Johnson, 682 So.2d 385, 391 (Ala.1996) (Maddox, J., concurring specially); see also Darden v. State, 571 So.2d 1272, 1279-80 (Ala.Cr.App.1990), quoting 1 W. Lafave, Search and Seizure § 3.2(e) at 591-92 n. 148 (2d ed. 1987) ("`If the function of arrest were merely to produce persons in court for purposes of their prosecution, then a more-probable-than-not-test would have considerable appeal. But there is also an investigative function which is served by the making of arrests.'" (Footnote omitted.)).
We conclude that Melson's arrest was supported by probable cause; therefore, the trial court did not err in admitting into evidence Melson's statement to police and the other evidence seized pursuant to the warrantless arrest.

VII.
Melson also contends that the trial court erred by admitting into evidence his tennis shoes, taken from him after his arrest, because, he says, the state failed to establish a proper chain of custody for the shoes. (Issue X in Melson's brief to this court.) Specifically, Melson argues that the state presented no evidence to identify who removed the tennis shoes from his feet. The record does not support Melson's contention.
Lieutenant Roger Bohannon of the Gadsden Police Department testified that he was involved in investigating the murders at Popeye's restaurant and that he was present when Melson was brought to the detective's division after his arrest. Bohannon testified that he did not recall who took the tennis shoes off Melson's feet, but that after being told by Sergeant Wayne Ragan to take custody of Melson's shoes, he went into the room where Melson was being held and told Melson that they needed his shoes. Bohannon further testified that he could not recall whether he or Captain Jeff Wright took Melson's shoes off his feet, but that he immediately took custody of Melson's shoes after they were removed. Bohannon testified that he maintained custody of the tennis shoes until he turned them over to Officer David Allen.[6]
In finding that the state had established a sufficient chain of custody to authenticate the shoes and to allow their admission into evidence, the trial court stated:
"Well, of course, the chain doesn't have tothe fact of the chain doesn't have to be an absolute certainty. We have got a room and we have got shoes and we have got somebody taking them off and then somebody verifying as to the shoes from that point on. I think that is sufficient."
(R. 1714.)
The purpose for establishing a chain of custody is to show to a reasonable probability that the evidence is authentic *880 and that there has been no tampering with the evidence. Land v. State, 678 So.2d 201 (Ala.Cr.App.1995), aff'd, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996). "`[I]t is not necessary to prove to an absolute certainty, but only to a reasonable probability, that the object is the same as, and not substantially different from, the object at the commencement of the chain.' Grice v. State, 481 So.2d 449, 451 (Ala.Cr.App. 1985)." Akin v. State, 698 So.2d 228, 233 (Ala.Cr.App.1996), cert. denied, 698 So.2d 238 (1997). "`[R]eal evidence is not [in]admissible because one can conjure up hypothetical possibilities that tampering occurred.' `If the trial court is satisfied that in reasonable probability the article has not been changed in any important respect, it may permit its introduction into evidence.'" Moorman v. State, 574 So.2d 953, 957 (Ala.Cr.App.1990), quoting United States v. Haldeman, 559 F.2d 31, 109 (D.C.Cir.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).
Here, the state presented sufficient evidence to establish that the tennis shoes taken from Melson at the time of his arrest were the same tennis shoes that were admitted into evidence at his trial. There was no evidence of tampering. The evidence presented at trial was sufficient to assure the authenticity and integrity of the tennis shoes.
Moreover, the tennis shoes were also admissible pursuant to § 12-21-13, Ala.Code 1975. Section 12-21-13 provides:
"Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."
Accordingly, we find no error as to this claim.

VIII.
Melson further contends that the prosecutor made an improper comment during his closing argument at the penalty phase of the trial. (Issue V in Melson's brief to this court.) Although the trial court sustained Melson's objection to the comment, Melson nonetheless argues that the trial court erred when it failed to give the jury a curative instruction concerning the comment. The record reveals the following, relevant to this claim:
"[The prosecutor]: ... The only photos we have shown you are photographs of the crime scene, but we also showed you photographs of what those kids looked like before they were murdered during that robbery so you would know how they really were without all that blood on them that he [Melson] put on them.
"[Melson's counsel]: Your Honor, I object again to this line of argument. He is arguing the fact that
"[The prosecutor]:Well, he objects every time
"[Melson's counsel]:Your Honor, may I state my objection for the record?
"The Court: Go ahead.
"[Melson's counsel]: My objection is that the District Attorney is arguing that the crimes were heinous, atrocious, or cruel by talking about the photographs of the way the bodies looked; that that is not an aggravating factor in this case. The only aggravating factor they can consider is that the murder happened during a robbery.
"[The prosecutor]: And I said `during the robbery.' [Melson's counsel] just don't want to listen, Judge, except *881 when we tighten the noose up a little bit.
"The Court: Just limit it to the one aggravating circumstance.
"[Melson's counsel]: I again object to the phrase `tightening the noose around his neck,' or my neck or [Melson's] neck.
"The court: Sustained. Strike that.
"[Melson's counsel]: Your Honor, we would request a jury chargeinstruction.
"[The prosecutor]: Can I proceed now, your Honor?
"The Court: Yes, go ahead.
"[The prosecutor]: Thank you."
(R. 2106-07.)
Although Melson requested "a jury charge" concerning the prosecutor's comment, he did not specifically request the instruction he now claims on appeal should have been given by the trial court. Furthermore, there was no ruling by the trial court on Melson's general request for a curative instruction. Thus, because Melson failed to obtain an adverse ruling on his request for curative instructions, we will review this issue pursuant to the plain error rule. See Travis v. State, 776 So.2d 819 (Ala.Cr.App.1997); R.D. v. State, 706 So.2d 770, 781 (Ala.Cr.App.1997), cert. denied, 525 U.S. 829, 119 S.Ct. 79, 142 L.Ed.2d 62 (1998).
Melson claims in his brief to this court that the "prosecutor's prejudicial introduction of the concept that there was a noose tightening around [Melson's] neck because [Melson's] counsel objected to impermissible argument required a curative instruction." (Melson's brief, p. 34.) Specifically, Melson argues that the trial court should have instructed the jury that the objection by counsel to the prosecutor's closing argument was not the proper subject of comment by the prosecution. (Melson's brief, p. 35.)
As evidenced from the above excerpt from the record, the trial court promptly sustained Melson's objection to the prosecutor's allegedly improper comment and ordered that the comment be struck from the record. "The general rule is that prejudicial statements, even though improper, are considered capable of being eradicated by the trial court in sustaining objections thereto or by appropriate instructions to the jury or both." Bui v. State, 551 So.2d 1094, 1109 (Ala.Cr.App. 1988), aff'd, 551 So.2d 1125 (Ala.1989), judgment vacated for further consideration in light of Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).
Here, assuming that the comment was improper, we find that "the sustaining of [Melson's] objections, in this instance, was sufficient to eradicate any possible prejudice to [Melson]. We do not believe that additional curative instructions were necessary, and the court's failure to give such was not erroneous." Bui, 551 So.2d at 1109-10. The trial court is in the best position to determine when closing arguments are prejudicial and what curative measures are necessary. See Gaddy v. State, 698 So.2d 1100 (Ala.Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.1997), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997). We do not find that the prosecutor's comment was so improper and prejudicial that the trial was required to give a curative instruction.
Assuming that the remark had any prejudicial effect, and further assuming that the prosecutor's remark was directed toward the objection by Melson's counsel during the state's closing argument, as Melson claims on appeal, it was eradicated by the trial court's prompt action in sustaining the objection and in striking the comment from the record. We find no error, plain or otherwise, as to this claim.

IX.
Melson also contends that the prosecutor engaged in misconduct at both the guilt and the penalty phases of his trial. (Issue *882 IV in Melson's brief to this court.) Initially we note that Melson did not object to many of the instances he now alleges were misconduct. "`This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'" Kuenzel v. State, 577 So.2d 474, 489 (Ala. Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). Thus, we must consider, in these instances, whether the prosecutor's comments and conduct constituted plain error. Rule 45A, Ala.R.App.P.
This court has stated that "[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract." Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App. 1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd, on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 276, 304 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). "In judging a prosecutor's closing argument, the standard is whether the argument `so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Cr.App.1978), and that court is given broad discretion in determining what is permissible argument." Bankhead, 585 So.2d at 105. We will not reverse the trial court unless there has been an abuse of that discretion. Id. We will now address each of Melson's claims of prosecutorial misconduct.

A.
Melson contends that during closing argument at the guilt phase of the trial, the prosecutor "disparaged" his constitutional right to a presumption of innocence until proven guilty. (Melson's brief, p. 20.) He further contends that the prosecutor attempted to improperly shift the burden of proof to Melson to prove his innocence. (Melson's brief, pp. 20-21.) Initially we note that Melson did not object to either of these alleged instances of prosecutorial misconduct; therefore, our review will be pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
The record reveals that the prosecutor stated the following during his closing argument at the guilt phase:
"The burden of proof that was told to you during the time that you were up here coming back into panels last week, and it had already been a weekor more than a week since you first came up here for this case last Wednesday but the burden of proof, as we discussed with each of you in each of the prospective panels that you were on, is on the people of the State of Alabama to convince each and every one of you beyond a reasonable doubt that the defendant is guilty of each element in each count. If any element in any count is not proven beyond a reasonable doubt as to that count, it would be your job to find the defendant not guilty if that wasn't proven....
". . . .
"... As I said, the burden is on us. The defendant comes in here presumed innocent and he stays innocent until the evidence that we produce convinces each *883 and every one of you beyond a reasonable doubt that he is guilty. Once that happens, that presumption of innocence does not stay with him anymore. It is kind of like he walks into the courtroom with a coat on. Every time somebody puts something on that points the finger at him and moves a little closer, that coat starts sliding down and pretty soon one sleeve is off and pretty soon the next sleeve is off and pretty soon he don't got no coat no more, and he is not entitled to that presumption. And our evidence, what we presented and what I'm going to be talking with you about, is going to show that. He is not entitled to the presumption of innocence at your hands anymore."

(R. 1781-82; 1784-85.) (Emphasis indicates that portion of the argument complained of on appeal.) We find nothing improper in the prosecutor's comments.
Contrary to Melson's claim on appeal, we do not find that the prosecutor improperly urged the jury to disregard Melson's constitutional right to be presumed innocent until proven guilty. The prosecutor, instead, was merely arguing to the jury that the state's evidence was sufficient to overcome that presumption, and that the state had proven beyond a reasonable doubt that Melson was guilty of the offenses with which he was charged. The prosecutor did not misstate the law. He accurately described to the jury the presumption of innocence afforded a defendant in a criminal trial.
Moreover, the trial court correctly charged the jury, in an instruction with language very similar to that of the prosecutor's complained-of comments, on the presumption of innocence. Specifically, the trial court instructed the jury as follows:
"Now, of course, to the indictment, and to each count of the indictment, the defendant has pled not guilty, and under the law of Alabama this places the burden on the State of Alabama in dealing with each of these counts to prove that to you beyond a reasonable doubt before the State would be entitled to a conviction. By a plea of not guilty the defendant comes into court, as we said earlier, clothed with the presumption of innocence, and that presumption goes with him throughout the trial. And I will explain that just a little bit more in a moment.
". . . .
"On `presumption of innocence,' this is not just an idle theory to be cast aside by a jury based on compassion or prejudice or anything of that nature. The presumption of innocence is a substantial part of the law of the land. It follows the defendant throughout the entire case, right into your deliberations, and it must not be lost sight of by you until it has been overcome by competent evidence which establishes his guilt beyond all reasonable doubt and to a moral certainty.
"The burden of proof always rests on the prosecution. I can't emphasize that any further. They must prove every essential element of the crime beyond a reasonable doubt. This burden of proof on the prosecution to establish the accused's guilt beyond a reasonable doubt never shifts. The accused is under no obligation to prove his innocence, nor is he under any obligation to prove anything."
(R. 1891-93.) As we have stated, jurors are presumed to follow the instructions given them by the trial court. Taylor v. State, 666 So.2d 36, 70 (Ala.Cr.App.), rem'd on other grounds, opinion extended and aff'd. on return to remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
Furthermore, the trial court also informed the jury that the comments of the attorneys were not evidence. (R. 1852.) We find no error, much less plain error, as to the prosecutor's comments concerning the presumption of innocence.
*884 We also find to be without merit Melson's claim concerning the prosecutor's allegedly improper comments on the burden of proof. The record reveals that during his rebuttal closing argument at the guilt phase, in response to Melson's counsel's closing argument and Melson's counsel's interpretation of the facts of the case, the prosecutor stated:
"Ladies and Gentlemen, I'm not going to come up here and spin tall tales and insult your intelligence either. I think [Melson's counsel] was trying to have you believe that Mundo Peraita [the brother of Melson's codefendant's] is a black man. If he had wanted to, he could have brought a picture up here of that to show you. But, see, he wants you to assume something that is not evidence. Mundo is a Latin just like his brother. He said, `Well, Bryant Archer sat there and he can't tell you that was the man.' Of course not, because [Melson's counsel] told you about 10 minutes ago that both of them had bandannas over their face, but then he comes in and says Mr. Archer couldn't identify Mr. Melson because he wasn't the man. Of course, he couldn't identify him because he had his face covered up. He talked about Mr. Peraita sending somebody on a wild goose chase. Folks, y'all didn't hear any evidence about that. I know some of you kind of looked funny about that. That is something that came up in a hearing back before the judge. I'm not going to come in here and tell y'all something that was not heard in this courtroom from that witness stand or from some of those exhibits. The only time Mundo has ever come up was about retrieving that weapon. Nobody has ever put Mundo Peraita anywhere around any of this or involved in any of that. And you know why? They know that. It's not right for them to come up here and argue an inference of something when they know that is not the facts in the case. I'm not going to do that and they ought to be ashamed for getting up here and telling y'all that because they know that is not true. Mundo threw the gun in the river and then he took the police later and showed them where it was. We can't go into why because that was hearsay, but they know why. It is not right to come up here and argue something as an inference when they know the facts point the other way. But, you see, when you don't have a heck of a lot to work with, you have to try to fabricate what you can, and it is a tough job for [Melson's counsel]. It is hard to defend somebody against a crime that they committed. It is very difficult to prove someone is innocent when they are not. I can stand here and tell you all day that Robert Melson is guilty, but my say so doesn't matter. It is what your verdict says."
(R. 1865-67.) (Emphasis indicates that portion of the argument complained of on appeal.) Contrary to Melson's contention in his brief to this court, the prosecutor's comment did not improperly shift the burden of proof to Melson to prove his innocence.
As the record reveals, the prosecutor correctly informed the jury that the state, and only the state, had the burden of proving beyond a reasonable doubt that Melson was guilty. (R. 1781-82.) The trial court later, and at great length, instructed the jury that the state always had the burden of proof to establish Melson's guilt beyond a reasonable doubt. (R. 1891-93.) The trial court informed the jury that that burden never shifted to Melson. Id. Again, jurors are presumed to follow the instructions of the trial court. Taylor, supra, at 70.
"A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury." Roberts v. State, 735 So.2d 1244, 1253 (Ala.Cr.App.1997). Taken in context, the prosecutor's isolated comment was clearly made in rebuttal to Melson's counsel's *885 interpretation of the evidence in his closing argument, which the prosecutor argued was spurious. The prosecutor was attempting to point out to the jury the weaknesses in the theory of the case advanced by Melson's counsel. Moreover, "statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict." Bankhead, 585 So.2d at 106. We do not believe that the prosecutor's comment was intended to mislead the jury, nor do we find that the comment improperly shifted the burden of proof to Melson to prove his innocence.
Even assuming that the prosecutor should not have made the comment, we would not find that a reversal is required. Because no objection was made to the comment, to warrant reversal the comment would have to constitute plain error. We do not find that the brief and isolated comment, in conjunction with the trial court's proper instructions to the jury concerning the burden of proof, was so egregious that it amounted to a miscarriage of justice. See Burton v. State, 651 So.2d 641, 645 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).

B.
Melson further contends that during closing argument at the guilt phase the prosecutor improperly referred to Melson as an "animal," who had "pumped four shots into Bryant Archer." (R. 1788.) Melson did not object at trial to this comment; thus, our review is for plain error. Rule 45A, Ala.R.App.P.
In addressing a claim similar to Melson's, we stated in Taylor v. State, supra:
"The district attorney's characterizations of the crime as a `massacre,' the crime scene as a `slaughterhouse,' and the appellant as a `graverobber' constituted proper inferences from the evidence.... The law is clear that `"[i]n a proper case, the prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case."` Nicks v. State, 521 So.2d 1018, 1023 (Ala.Cr.App.1987), affirmed, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)."
666 So.2d at 65; see also Bankhead, 585 So.2d at 106 (derogatory or opprobrious characterizations are not improper when they are based on the evidence). It is not enough that a prosecutor's comment in closing arguments was undesirable or even universally condemned; the question instead is whether the comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Burton, 651 So.2d at 651, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986).
Here, the prosecutor's reference to Melson as an "animal" accorded with the evidence presented at trial concerning the brutal and cold-blooded nature of the murders. Moreover, as we have previously stated, a prosecutor's comment must be viewed as delivered in the heat of debate, and, as such, is usually valued by the jury at its true worth. "`[W]e must not lose sight of the fact that a trial is a legal battle, a combat in a sense, and not a parlor social affair. The solicitor is yet under duty to prosecute with earnestness and vigorto strike hard blows, but not foul ones.' Berger v. United States, [295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)]." Taylor, 666 So.2d at 64, quoting Arant v. State, 232 Ala. 275, 280, 167 So. 540, 544 (1936). We find no plain error here.
Melson also contends that the prosecutor improperly commented on his "bad character" when, during closing arguments, he read portions of a letter written by Melson and properly before the jury, in *886 which Melson wrote that his family would not help him after he was arrested for the murders. (C. 809.) The letter was written to Melissa King in an attempt to get King to give a false statement to police that would provide Melson with an alibi on the night of the robbery and murders. After reading the letter to the jury the prosecutor commented, "Well, I'll tell you something about somebody when their own family won't back them up, and that is out of his pen and this is his words and his letter." (R. 1803.) Melson did not object to the prosecutor's comment; thus, our review is for plain error. Rule 45A, Ala. R.App.P. We find no merit to Melson's claim.
As we stated in Taylor, supra:
"`While in argument to the jury, counsel may not argue as a fact that which is not in evidence; nevertheless, he may state or comment on proper inferences from the evidence and may draw conclusions from the evidence based upon his own reasoning. Sanders v. State, 423 So.2d 348 (Ala.Crim.App.1982); Speigner v. State, 369 So.2d 39 (Ala.Crim.App.), cert. denied, 369 So.2d 46 (Ala.1979); Liner v. State, 350 So.2d 760 (Ala.Crim. App.1977). The prosecutor, as does defense counsel, has a right to present his impressions from the evidence. Sanders, supra; Hayes v. State, 395 So.2d 127 (Ala.Crim.App.1980), cert. denied, 395 So.2d 150 (Ala.1981); McQueen v. State, 355 So.2d 407 (Ala.Crim.App. 1978). He may argue every legitimate inference and may examine, collate, shift and treat the evidence in his own way. Sanders, supra; Hayes, supra; McQueen, supra. Liberal rules are allowed counsel in drawing inferences from the evidence in their argument to the jury, whether they are truly drawn or not. Sanders, supra; Liner, supra; Smith v. State, 344 So.2d 1239 (Ala. Crim.App.), cert. denied, 344 So.2d 1243 (Ala.1977). Control of closing argument rests in the broad discretion of the trial judge and, where no abuse of discretion is found, there is no error. Thomas v. State, 440 So.2d 1216 (Ala.Crim.App. 1983); Robinson v. State, 439 So.2d 1328 (Ala.Crim.App.1983); Elston v. State, 56 Ala.App. 299, 321 So.2d 264 (1975). The trial judge can best determine when discussion by counsel is legitimate and when it degenerates into abuse. Hurst v. State, 397 So.2d 203 (Ala.Crim.App.), cert. denied, 397 So.2d 208 (Ala.1981); Garrett v. State, 268 Ala. 299, 105 So.2d 541 (1958).'"
666 So.2d at 64, quoting Sasser v. State, 494 So.2d 857, 859-60 (Ala.Cr.App.1986). The prosecutor's comment was a proper inference to be drawn from the evidence and was not, as Melson argues on appeal, an improper reference to his bad character. No error, much less plain error, occurred here.
Melson further contends that the prosecutor made other improper comments concerning the letter written by Melson to King. During closing argument at the guilt phase the prosecutor discussed the evidence that had been presented as to Melson's different versions of his whereabouts on the night of the robbery and murders. During his argument, the prosecutor compared Melson's versions of where he was on the night of the robbery and murders to portions of the letter written to King. The prosecutor stated the following to the jury:
"... `Dear Melissa, don't do this to me. Don't do this to me.' Don't do what to him? Not go to court and lie for him? Not go to his lawyer's office and lie for him? I will come back to this in just a minute.... I want you to look at the third line in this letter. He is telling Melissa and talking to her about what her feelings ought to be back to him, `when you love someone you don't ever stop loving that person for something that they have done.' What had he done that he felt like might cause her to stop loving him? Well, with the exception of story number one I guess it is hanging out at Frankie's would have made her *887 stop loving him because that's all it was. What had he done that he thought would make her stop loving him? Well, he is asking her to come up here and tell y'all something as this jury and is wanting her to go tell his lawyer something. We know she didn't. She told you she didn't. Why? `[Melson] wanted me to go lie for him and I wouldn't do it. [Melson] wanted me to come to court and commit perjury for him, but I wouldn't do it.' Folks if you haven't done something, you don't need anybody to lie for you."
(R. 1803-05.) (Emphasis indicates that portion of the argument complained of on appeal.)
Clearly, the prosecutor was commenting on evidence properly before the jury and was arguing legitimate inferences that could be drawn from that evidence. Thus, we do not find that the prosecutor's comments were used to establish Melson's bad character. No plain error occurred as to this matter.
Within his prosecutorial misconduct claims, Melson has included a claim that the state presented irrelevant and immaterial testimony through its witness Laura M. Laverty. Specifically, Melson claims that Laverty's testimony was used solely to establish his bad character. (Melson's brief, p. 22.) Laverty testified that she had visited Melson in jail after the murders, and that Melson had told her at that time to talk to Melissa King and a "guy named Big Dirt" and to get them to talk to his lawyers about providing him with an alibi. The record reveals that the following occurred during the state's direct examination of Laverty:
"[The prosecutor]: Did you have occasion to speak with both Melissa and Big Dirt after [Melson] had asked you to?
"[Laverty]: Yes.
"[The prosecutor]: I'm not going to ask you what you said, but were they able to confirm what he had asked them to confirm?
"[Melson's counsel]: Your Honor, that would be equally objectionable as to what was said.
"The Court: Hearsay.
"[The prosecutor]: I will withdraw it and ask this.
"The Court: Sustained.
"[The prosecutor]: Did either one of them ever go then to his lawyer, that you are aware of, to provide him that alibi?
"[Laverty]: Not that I'm aware of.
"[The prosecutor]: Not that you're aware of."
(R. 1148-49.) The record further reveals the following, which occurred during redirect examination of Laverty:
"[The prosecutor]: Ms. Laverty, you said you only saw Mr. Melson for a little over a month after he was arrested and then you quit seeing him after that?
"[Laverty]: Yes.
"[The prosecutor]: How long was itDo you recall how long he had been in jail before he first asked you to go talk to Melissa and Big Dirt?
"[Laverty]: Not long.
"[The prosecutor]: Not long? How long was it before you finally got a chance to talk to him?
"[Laverty]: Probably a week.
"[The prosecutor]: Okay. Did what you learned from them have anything to do with why you didn't go see [Melson] anymore?

"[Laverty]: Maybe a little.

"[Melson's counsel]: I object again, Your Honor.
"The Court: Sustained.
"[The prosecutor]: I withdraw it. That's all. Thank you. Nothing further."
*888 (R. 1158-59.) (Emphasis indicates that portion of the argument complained of on appeal.)
On appeal, Melson argues that the testimony elicited during the redirect examination of Laverty was improper because, he says, it "insinuated that Melson had engaged in bad conduct," and allowed the jury to speculate about what someone had said about Melson that was "serious enough to end a relationship." (Melson's brief, p. 22.) Although Melson objected at trial to the prosecutor's question, his objection came after Laverty had answered the question; therefore, it was untimely.[7] See Sexton v. State, 529 So.2d 1041 (Ala. Cr.App.1988) (when a question is asked of a witness calling for an inadmissible matter, the party against whom it is offered must object after the question, but before the answer; an objection not made until after a responsive answer is given is too late); Wilson v. State, 651 So.2d 1119 (Ala. Cr.App.1994) (trial court's ruling on an untimely objection will not be considered error without a motion to exclude and an adverse ruling).
Furthermore, Melson's objection was sustained, and the prosecutor stated that he would withdraw the question. After the trial court sustained the objection, Melson did not raise any further objections, request curative instructions, or move for a mistrial. Thus, there is no adverse ruling before this court for review. See Davis v. State, 740 So.2d 1115 (Ala.Cr. App.1998).
Considering the impact of the challenged question and answer within the context of Melson's trial, we do not find that Laverty's testimony amounted to plain error. The trial court's sustaining of Melson's objection was sufficient to eradicate any possible prejudice to Melson. We find no plain error as to this matter.

C.
Melson contends that the prosecutor improperly commented during closing argument at the guilt phase that Melson had shown no remorse for the robbery and murders. Although Melson claims that the prosecutor's comments were prejudicial, he has cited no authority to support his claim. The record reflects that the prosecutor compared Melson's shoe prints, which were left at the crime scene, to Lady MacBeth's "damn spot," pointing out that the footprints would not go away. The prosecutor then made the following comments:
"[The prosecutor]: ... [Y]ou know, it doesn't matter what you do, your conscience always ends up catching up with you. [Melson's] hasn't yet. He has sat here and smirked and smiled and laughed. Y'all had a chance to look at his
"[Melson's counsel]:Your Honor, I object. I would like to make an objection for the record.
"The Court: Go ahead.
"[Melson's counsel]: I object to the D.A. commenting that [Melson] has sat here and smirked and smiled and laughed. I think that is an improper comment.
"The Court: Sustained.
"[The prosecutor]: Well, whatever you noticed about his demeanor.
"[Melson's counsel]: Your Honor,
"[The prosecutor]:It didn't change

*889 "[Melson's counsel]: Your Honor, I would like to move for a mistrial based upon that because he is still going on.
"The Court: Don't get into that. I'm denying the mistrial, but go on to some other subject."
(R. 1873-74.)
As the above-quoted excerpt from the record reveals, Melson's objection to the prosecutor's comments was sustained. "`A mistrial is a drastic and extreme measure which should be granted only when the prejudicial qualities of the comment cannot be eradicated by instruction or other action by the trial court.' Hurst v. State, 469 So.2d 720, 724 (Ala.Cr. App.1985)." Daniels v. State, 650 So.2d 544, 555 (Ala.Cr.App.1994), cert. denied, 514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995); see also Arthur v. State, 711 So.2d 1031, 1052 (Ala.Cr.App.1996), aff'd, 711 So.2d 1097 (1997). "`The grant or denial of a mistrial is a matter within the sound discretion of the trial court and will only be disturbed upon a showing of manifest abuse.'" Whitt v. State, 733 So.2d 463, 481 (Ala.Cr.App.1998), quoting Huffman v. State, 706 So.2d 808, 809 (Ala.Cr. App.1997).
Here, the trial court's prompt sustaining of Melson's objection was sufficient to eradicate any possible prejudice to Melson as a result of the comment. We note, however, that we are not convinced that the trial court ruled correctly in sustaining Melson's objection. "`The conduct of the accused or the accused's demeanor during the trial is a proper subject of comment." Bailey v. State, 625 So.2d 1182, 1183 (Ala. Cr.App.1993), quoting Wherry v. State, 402 So.2d 1130, 1133 (Ala.Cr.App.1981) (emphasis in omitted in Bailey). However, as we stated above, assuming any error occurred as a result of the prosecutor's comments, the trial court's actions were sufficient to eradicate any resulting prejudice.
Melson also contends that during closing argument, the prosecutor again improperly referred to Melson's lack of remorse, when he stated the following to the jury: "Melson is a cold-blooded murderer. He didn't blink one eye. He showed no remorse as he emptied an eight-shot clip full of .45 slugs into four kids who were just trying to earn a decent living." (R. 1878-79.) Melson did not object to these comments at trial; therefore, our review is for plain error. Rule 45A, Ala.R.App.P.
The prosecutor's comments were clearly supported by the evidence presented at trial concerning the brutal nature of the murders. The prosecutor has a right to present his impressions from the evidence. Taylor, supra at 64. The prosecutor's comments were legitimate inferences to be drawn from the evidence. We do not find that the comment on Melson's lack of remorse "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Bankhead, supra at 107. Thus, no error, plain or otherwise, occurred as to this claim.

D.
Melson asserts that the prosecutor improperly told the jurors that in order to do their job and to honor their oaths as jurors, they had to return guilty verdicts against Melson. Specifically, Melson refers to a portion of the prosecutor's closing argument at the guilt phase of the trial. Melson did not object to the comment that he now claims requires a reversal of his conviction; therefore, we will review his claim pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
The record reveals that the prosecutor made the following comment to the jury:
"You are fair and you are reasonable people and you are going to do the right thing in this case. I'm convinced of that because if you weren't, you wouldn't be sitting on this jury right now.
"My saying Robert Melson is guilty doesn't make him guilty, but your verdict does. I want you to be able to go home at the conclusion of your service *890 on this trial with what one of our judges used to call an inner satisfaction of a job well done. You can do that when you bring back [verdicts finding Melson guilty of Counts I-VI of the indictment].... When you have returned those verdicts, you will have done your duty and you will have kept your oath to Almighty God when you raised your hand and said that you would a true and fair verdict render according to the evidence, and when you have done that, nobody has a right to complain."
(R. 1879-80.) We find nothing in the prosecutor's argument that exceeded the bounds of proper comment.
As we have stated, "[g]enerally, the prosecutor is in error by exhorting the jury to `do what's right,' or to `do its job,' if that exhortation `impl[ies] that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law. See United States v. Young, 470 U.S. [1] at 18, 105 S.Ct. [1038] at 1047 [,84 L.Ed.2d 1 (1985) ].' Arthur v. State, 575 So.2d 1165, 1185 (Ala.Cr.App.1990), cert. denied, 575 So.2d 1191 (Ala.1991)." McNair v. State, 653 So.2d 320, 339-40 (Ala.Cr.App.1992), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995).
However, we do not find that the prosecutor in this case was making any such exhortation for the jury to return guilty verdicts regardless of the evidence presented at trial. In fact, the prosecutor stated in his argument that a true and fair verdict must be rendered according to the evidence. Moreover, the trial court properly instructed the jury that its verdicts must be based on the evidence presented at trial and in accordance with the law as it was charged by the trial court. (R. 1883, 1886; 1906.)
In Taylor v. State, supra, we held:
"The appellant objects for the first time on appeal to the argument of the district attorney urging the jury to `do our duty' and find the appellant guilty, and for the jury to `do the right thing' and recommend death for the appellant. R. 1136, 1379. We find no plain error in these remarks. `In a very real sense, a jury does have a "duty" to convict the accused of the offense charged in the indictment if it finds the accused guilty of that offense beyond a reasonable doubt.' Kuenzel v. State, 577 So.2d 474, 517 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)."
666 So.2d at 65. Here, the prosecutor was merely arguing to the jury that the evidence was sufficient to prove beyond a reasonable doubt that Melson was guilty and that, therefore, the jury should return guilty verdicts on all counts of the indictment. It is not improper for the prosecutor to express his opinion that the accused is guilty, so long as it is apparent that such opinion is based solely on the evidence. Price v. State, 725 So.2d 1003 (Ala.Cr.App. 1997), aff'd, 725 So.2d 1063 (Ala.1998). The prosecutor was not, as Melson alleges on appeal, arguing to the jurors that only guilty verdicts would allow them to honor their oaths to God.
In rejecting a claim that the admission of victim impact evidence during the guilt phase of the trial was not plain error, the Alabama Supreme Court stated the following in Ex parte Rieber, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995):
"It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspectedthat Ms. Craig [the murder victim] was not a `human island,' but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter's opinion concurring *891 in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991))."
663 So.2d at 1006.
While directed to a different claim of error, the reasoning in Ex parte Rieber is applicable to Melson's claim in the present case: it should come as no surprise to jurors serving on a jury in a capital murder trial that the prosecution is seeking a conviction, and that the prosecution is confident that its evidence will prove the defendant's guilt beyond a reasonable doubt. The prosecutor's comments were not, as Melson urges, an expression of his personal opinion as to Melson's guilt. They were, instead, merely the prosecutor's impression of the evidence. Thus, for the reasons stated above, we find no plain error as to this claim.

E.
Melson contends that at the penalty phase of the trial, the prosecutor improperly argued to the jury what he says were nonstatutory aggravating circumstances. Specifically, Melson refers to the prosecutor's comments that Melson had caused a great deal of hurt to a lot of people in his life, including his family and friends; that Melson's grandmother had had to come to court and testify for him and had to go through the ordeal of the trial; and that Melson had blamed everything bad that had happened in his life on other people, but it was now time for him to accept responsibility for his own actions. The record reflects that the only comment objected to by Melson at trial was the prosecutor's comment concerning his grandmother. Thus, our review of the other comments by the prosecutor will be for plain error. Rule 45A, Ala.R.App.P.
We have reviewed all of the complained-of comments, both in the context of the entire closing argument and in the context of the entire trial, and we do not find that any of the comments amounted to argument of nonstatutory aggravating circumstances. To the contrary, the comments were proper comments based on the evidence and the inferences to be drawn from the evidence. As the state correctly points out in its brief to this court, Melson had argued as nonstatutory mitigating circumstances that he loved his family and that his family loved him, and that he had had a difficult family history. Once Melson offered these nonstatutory mitigating circumstances, the state had the burden of disproving the existence of the mitigating circumstances by a preponderance of the evidence. See § 13A-5-45(g), Ala.Code 1975. Here, the prosecutor's comments were within the permissible range of proper argument; the prosecutor was merely attempting to rebut the mitigating evidence offered by Melson, rather than arguing to the jury nonstatutory aggravating circumstances.
In addition, the jury was properly instructed that it could consider only one aggravating circumstancethat the murder was committed during a robbery. We find that there was no reasonable possibility that the prosecutor's comments misled the jury or misinformed the jury concerning its responsibility at sentencing and the appropriate factors that it could consider in aggravation. For the reasons stated above, we do not find error, plain or otherwise, concerning the prosecutor's comments.

F.
Melson further contends that the prosecutor improperly argued to the jury during his rebuttal argument at the penalty phase of the trial that Melson should be sentenced to death in accordance with God's laws. Specifically, Melson contends that the prosecutor's comments urged the jury to recommend a death sentence based on passion and prejudice; that the comments lessened the jury's responsibility in recommending death by indicating that the jury was bound by God's laws to do so; and that the comments encouraged the jury to draw on religious law, which Melson *892 claims was a factor that should not have been considered because it was not evidence in the case. None of the complained-of comments were objected to by Melson at trial; therefore, we will review the comments pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
In support of his claims, Melson specifically refers in his brief to a small portion of the prosecutor's rebuttal argument. In deciding this issue, we find it important to discuss the argument by Melson's counsel during closing arguments at the penalty phase, an argument not mentioned by Melson in his brief on appeal. Almost all of Melson's counsel's argument dealt with God's mercy. For example, Melson's counsel began his argument to the jury with the following comments:
"You are going to take in your beliefs. You are going to listen to what the Judge tells you. Everybody has a different belief. When [the victims] were shot in the head, as they were falling, my thinking is before they hit the ground they were caught by the hands of God. That's my thinking. Before they hit the ground, as fast as all that happened, God caught them in his hands and God took them in. They were out of pain...."
(R. 2118-19.) Melson's counsel continued:
"Everyone can agree that Michelangelo was irreplaceable, but when God says of a drunken trampor I submit when God says of a murderer`but I loved that one. I did not want him lost.' This woman wrote `God's other children would try to see that point.' We would see it after all if the tramp's mother had said it. `I loved that one.' Or Smith loved that one. Mayo Melson loved this one. We did not want to see him lost."
". . . .
"All during last night, whether I was dreaming it or whether I was imagining it, I guess I was trying to pick a jury of 12 Christs because I think all individually we seek ... to meet the Christ in other people. We seek to see that, and everybody has something within themselves. Robert Melson had it when he was a young boy. Those people saw something in Robert Melson, some spark of good they saw in him back then, and I think each and every one of us as we go through life, we want to meet that in somebody. We don't want to say `that person is totally bad. That person is beyond redemption. Cut that person out of society.'"
(R. 2120-22.) Melson's counsel concluded his closing argument with the following comments:
"You have got to go back and make a decision, and even though in one sense you are the judge, I'm just going to leave with this quote: `I say this: None of us dare judge the life of another. That is God's prerogative, and His judgment is matched by His mercy.' And I don't think any of us dare judge the life of another. That's up to God, and I think His judgment is matched by His mercy. And that is what we are asking you to consider. Thank you."
(R. 2123-24.)
The above-quoted excerpt from the record reveals that Melson's counsel put the prosecutor in the position of having to reply to his arguments. As the state correctly points out in its brief to this court, the prosecutor never mentioned "God" in closing argument to the jury until he responded to Melson's counsel's arguments in his rebuttal comments:
"[Melson's counsel] has talked with you at great length about God, religion, and things like that and have you believe, I guess, that maybe we, as human beings, have no right to sit in judgment of our fellow human beings, but the Bible does not teach us that. Our Lord told us that we were to render unto God the things that were God's, but we were to render unto Caesar what was Caesar's. He came not to change the law, but merely to fulfill it, and the law then as is the law now, `Thou shalt not murder.' *893 That was the law from our God. It was handed down there. There are some 70 different capital offenses mentioned in the Old Testament. Those were the laws of the chosen people of God and those were the laws that came from God. God does not invoke capital punishment, but God has made provision for [us], as a society, to be able to make sure that we can continue to live in a law-abiding society without having to worry about the fear and threat of the criminal element prohibiting us from even coming out in the light of day. Those were laws for society. Part of the laws that God gave to Moses up on that mount dealt with how his people were to do in relation to him, but the rest of them dealt with how we were to deal in relation with each other, and when you violate the laws with regard to how you deal with God, God deals with you. When you broke the laws that dealt with how you dealt with your fellow man, then your fellow man has the right to deal with you."
(R. 2127-28.)
We find that the prosecutor's comments, when taken in context with the entire closing arguments, were proper as a reply in kind to the Biblical argument made by Melson's counsel during closing argument that no man "dare judge the life of another. That's up to God." (R. 2124.) "`A prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel. See Ex parte Rutledge, 482 So.2d 1262, 1264 (Ala. 1984).' DeBruce v. State, 651 So.2d 599, 609 (Ala.Cr.App.1993)." Taylor, 666 So.2d at 65. The prosecutor's argument permissibly sought to differentiate between God's laws and man's laws, so as to counter the argument by Melson's counsel that only God can judge and punish man. See Daniels v. State, 650 So.2d at 561 (Ala.Cr.App. 1994).
Furthermore, "`[a]rgument of counsel should not be so restricted as to prevent reference, by way of illustration, to historical facts and public characters, or to principles of divine law or biblical teachings.' General appeals for law enforcement are within the permissible range of a prosecutor's closing argument." Williams v. State, 710 So.2d 1276, 1301 (Ala.Cr.App. 1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998) (citations omitted).
Melson also contends that the following comment by the prosecutor during closing argument at the penalty phase was improper:
"But they don't have any right to come up here and ask you for any sympathy. None. If they do ask you for mercy, I want you to give some mercy to [Melson] just as he gave to the murder and robbery victims over there in that cooler. As you sow, so also shall ye reap. He who troubles his own house ends up inheriting the wind. And he really, although he has a right to come and ask you, he does not deserve nor can he ever command anything other than the death penalty for his actions."
(R. 2109.) (Emphasis indicates that portion of the argument complained of on appeal.) This comment was not objected to by Melson at trial; therefore, our review is for plain error. Rule 45A, Ala. R.App.P.
Melson claims that the prosecutor's "argument for proportionality grounded in retributive principles ignored the Eighth Amendment and eliminated mitigation from the jurors' consideration." (Melson's brief, p. 32.) We find no merit to this claim.
Our review of the record reveals that immediately before the comments complained of on appeal, the prosecutor argued to the jury that the aggravating circumstance in Melson's case clearly outweighed the mitigating circumstances. Specifically, he addressed the circumstances offered by Melson in mitigation and Melson's argument that the jury should show Melson mercy. In Jenkins *894 v. State, 627 So.2d 1034 (Ala.Cr.App. 1992), aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, U.S. 1012, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994), we found that the following comment by the prosecutor during closing argument during the penalty phase, which was similar to the prosecutor's comment in Melson's case, was proper:
"`We don't want vengeance at all. Nobody ever asked for vengeance, and I hope I haven't insinuated that in any manner. We don't want vengeance. And I speak on behalf of everybody connected with this case. We want you to be fair to that defendant right there. I want you to be fair. I want you to have the same amount of mercy on him when you go back there and deliberate his fate that he had on Tammy Hogeland [the victim] the morning of the 18th out there on that bank on the side of I-59 when he strangled the life out of her. That's all we ask. If you will do that, show him the same amount of mercy he showed Tammy, you will return a death penalty recommendation in this case.'"
627 So.2d at 1051. Here, the prosecutor's statement, "`was no more than a compelling statement of the victim's death and its significance, relevant to the retributive function of the death penalty.'" See Holladay v. State, 549 So.2d 122, 131 (Ala.Cr. App.1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989), quoting Brooks v. Kemp, 762 F.2d 1383, 1410 (11th Cir.1985), vacated and remanded on other grounds, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), reinstated on remand, 809 F.2d 700 (11th Cir.), cert. denied, 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 744 (1987).
For the reasons stated above, we do not find that the prosecutor's comments were improper.

G.
Lastly, Melson contends that the cumulative effect of the prosecutor's alleged misconduct warrants a reversal of his conviction. Because we find that no single instance of the prosecutor's conduct was improper, any claim that the alleged improper conduct had a cumulative prejudicial effect on his trial is without merit. See Stewart v. State, 730 So.2d 1203, 1212 (Ala.Cr.App.1997), aff'd, 730 So.2d 1246 (Ala.1999); Hunt v. State, 642 So.2d 999 (Ala.Cr.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).

X.
Melson contends that the trial court erred in denying his motion for a mistrial because, he says, the prosecutor improperly elicited testimony from a state's witness, Officer Wayne Ragan, that Peraita, Melson's codefendant, was the source of the information that led the police to seize the tennis shoes Melson was wearing when he was arrested. (Issue III in Melson's brief to this court.) Melson contends that the admission of the testimony was improper because, he claims, it resulted in an admission at Melson's trial of a portion of Peraita's statement to police. This, he says, denied him the right to confront a nontestifying witness. (Melson's brief, p. 16.) We find no merit to Melson's contention.
Initially we note that "[t]he granting of a mistrial is an extreme measure and should be exercised only when manifestly necessary or when the ends of justice would otherwise be defeated. The granting of a mistrial is addressed to the broad discretion of the trial judge, and his ruling will not be revised on appeal unless it clearly appears that such discretion has been abused." Grimsley v. State, 678 So.2d 1197, 1206 (Ala.Cr.App.1996) (citations omitted).
Our review of the record reveals that the prosecutor questioned Ragan about his gathering, pursuant to a search warrant, various items of evidence from Peraita's house after Peraita and Melson were arrested. The prosecutor specifically asked Ragan about the tennis shoes found in *895 Peraita's house that Peraita was allegedly wearing on the night of the murders. When the prosecutor asked Ragan the source of the information that led the police to seize Peraita's tennis shoes, Melson's counsel objected on the ground that because the source of the information was Peraita, Melson would be denied his Sixth Amendment right to confrontation. The prosecutor responded that he was not asking Ragan what the information was, just who provided him with it. The trial court stated that because the prosecutor was not offering the information for its truth, but instead to show what led the police to act and to seize Peraita's tennis shoes, he would overrule the objection and allow Ragan to answer the question.
The record reveals that the prosecutor then asked Ragan the source of the information that led the police to seize Melson's tennis shoes. Ragan answered, "Peraita," and Melson's counsel again objected on the ground that the answer would deny him the right of confrontation. The trial court sustained the objection. Melson's counsel then requested that the jury be instructed to disregard Ragan's answer. The trial court instructed the jury to "[s]trike that answer because it [was] solicited information from somebody who [was] not [there] to be cross-examined, that being Peraita. So disregard that answer." (R. 1461.) Melson's counsel then moved for a mistrial. The trial court denied the motion for a mistrial, but asked the jurors whether any of them would have a problem disregarding the answer. None of the jurors indicated that they would have a problem following the trial court's instructions.
We find, contrary to the trial court's ruling, that there was nothing improper about the prosecutor's question to Ragan and Ragan's answer.[8] "`Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' Edward W. Cleary, McCormick on Evidence 584 (1972)." James v. State, 723 So.2d 776, 779 (Ala.Cr.App.), cert. denied, 723 So.2d 786 (Ala.1998); see also Drinkard v. State, 777 So.2d 225, 247-48 (Ala. Cr.App.1998). Here, the prosecutor did not ask Ragan why he seized Melson's tennis shoes; therefore, we cannot say that he was attempting to use Peraita's statement to police to prove that Melson was wearing a particular pair of tennis shoes on the night of the robbery and murders. The prosecutor instead properly asked Ragan the source of the information that prompted him to seize Melson's tennis shoes. See Mason v. State, 768 So.2d 981 (Ala.Cr.App.1998); McCray v. State, 548 So.2d 573, 576 (Ala.Cr.App.1988). We find that Ragan's answer did not constitute hearsay and, therefore, Melson was not denied his right to confrontation. There was no "out-of-court-asserter." See James, supra. The only person for Melson to confront and cross-examine concerning Ragan's answer was Ragan.
Even assuming that the prosecutor's question and Ragan's answer were improper, the trial court's prompt sustaining of the objection and its instruction to the jury to disregard the answer, immediately followed by its questioning the jurors to ascertain whether any of them would in fact have a problem following the trial court's instruction to disregard Ragan's answer, eradicated any possible prejudice *896 suffered by Melson as a result of the reference to Peraita. See Stanton v. State, 648 So.2d 638, 643-44 (Ala.Cr.App.1994); Mc-Arthur v. State, 591 So.2d 135, 137 (Ala.Cr. App.1991); McDonald v. State, 516 So.2d 868, 871 (Ala.Cr.App.1987). For these reasons, we find that the trial court did not abuse its discretion in denying Melson's motion for a mistrial.

XI.
Melson contends that the state failed to present sufficient evidence to support his convictions for capital murder. (Issue IX in Melson's brief to this court.) Specifically, he argues that the only evidence linking him to the robbery and murders at Popeye's was Melson's statement to police that he had been with Peraita all night on the night of the crime and the plaster casts made of shoeprints at the crime scene that were positively identified as matching the shoes Melson was wearing at the time of his arrest. (Melson's brief, pp. 45-46.) Melson argues that this evidence was insufficient because the surviving victim was unable to identify Melson as the black man who was with Peraita during the robbery; because Melson never admitted to participating in the robbery and murders; because the murder weapon belonged to Peraita and the ammunition clip found in the weapon had Peraita's fingerprints on it; and because there were no fingerprints, blood, clothing, hair, or fibers linking Melson to the crime scene.
In White v. State, 546 So.2d 1014, 1016-18 (Ala.Cr.App.1989), this court set out the standards for appellate review of the sufficiency of the evidence to support a conviction. Applying those principles to the facts of this case, we find that the state's evidence was clearly sufficient to support Melson's convictions. The fact that much of the evidence linking Melson to the robbery and murders at Popeye's was circumstantial does not render the state's evidence insufficient.

SENTENCING ISSUES

XII.
Melson contends that the trial court improperly refused his sentence-phase written requested jury instruction informing the jury that it could consider mercy in its sentence recommendation. (Issue VI in Melson's brief to this court.) Melson's requested jury charge number 32 read as follows:
"Even if you find one or more aggravating circumstances beyond a reasonable doubt, you may impose a sentence of life in prison without possibility of parole for any reason. You need not find a mitigating circumstance in order to impose a sentence of life imprisonment without parole. Nothing in the law forbids you from extending mercy out of compassion or belief that life imprisonment is sufficient punishment under all the circumstances of this case."
(C. 287.) This charge was clearly an incorrect statement of the law, and the trial court properly refused to give it.
In Rieber v. State, 663 So.2d 985 (Ala. Cr.App.1994), aff'd, 663 So.2d 999 (Ala.), 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995), we held that an almost identical instruction was properly refused by the trial court. In Rieber, we stated:
"In Whisenhant v. State, 482 So.2d 1225 (Ala.Crim.App.1982), aff'd. in part, 482 So.2d 1241 (1983), the court refused to give a similar charge. In Whisenhant, the defendant asked the court to tell the jury that it could recommend mercy for the defendant regardless of whether any evidence of mitigating circumstances was preserved. In finding that the defendant's requested instruction was an erroneous statement of law, this court held:
"`The correct principle underlying this issue is stated in [Beck v. State, 396 So.2d 645, 663 (Ala.1992)] as follows:
"`"The court shall instruct the jury that in determining whether to *897 fix a punishment of death, the jury must weigh the aggravating and mitigating circumstances in determining whether to fix the punishment at death. The trial court shall instruct the jury to avoid any influence of passion, prejudice or other arbitrary factor while deliberating and fixing the sentence."
"`Clearly, it is the duty of the jury to weigh mitigating and aggravating circumstances in its decision. The jury is not free, as appellant's charge suggests, to arbitrarily ignore any factor, positive or negative, in arriving at the correct sentence.
"`As well, we view Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), to have tacitly held that the availability of such a mercy option to the sentencing authority is not a constitutional requirement. As Mr. Justice White's concurring opinion in Proffitt points out, the sentencing authority in Florida is required to impose the death penalty on all first degree murderers as to whom the statutory aggravating circumstances outweigh the mitigating circumstances. Proffitt at 260 [96 S.Ct. at 2970]. This required imposition of the death penalty, regardless of mercy, passed constitutional muster in Proffitt, and is in keeping with the concern that arbitrary and capricious imposition of the death penalty be avoided. Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982).'

"Whisenhant, 482 So.2d at 1236. See also Morrison v. State, 500 So.2d 36 (Ala.Crim.App.1985), aff'd, 500 So.2d 57 (1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987)."
663 So.2d at 996. We also stated the following in Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998):
"The United States Supreme Court in Boyde v. California, 494 U.S. 370, 377, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990), addressed this issue as follows:
"`Petitioner suggests that the jury must have freedom to decline to impose the death penalty even if the jury decides that the aggravating circumstances "outweigh" the mitigating circumstances. But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence "in an effort to achieve a more rational and equitable administration of the death penalty." Franklin v. Lynaugh, 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988) (plurality opinion).'
"We have rejected arguments in prior capital cases that the defendant is entitled to a jury instruction that the jury has unbridled discretion to recommend a sentence of life imprisonment without the possibility of parole regardless of the evidence pertaining to aggravating and mitigating circumstances. See, e.g., Smith v. State, 581 So.2d 497 (Ala.Cr. App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). In Williams v. State, supra, 601 So.2d 1062, 1081, we stated as follows:
"`The appellant next argues that the trial court erred in failing to instruct the jury on "their unfettered option" to impose a sentence of life without parole. The jury may not recommend mercy without reason. See Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 *898 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). The jury does not have an "unfettered option" to recommend a sentence of life without parole unless after weighing the aggravating and mitigating circumstances it finds that life without parole is warranted.'
"We find no merit in the appellant's contention that he was entitled to a jury instruction that the jury had an unfettered option to return a recommendation of life imprisonment without the possibility of parole regardless of `its calculus as to aggravators and mitigators.' Kuenzel v. State, 577 So.2d at 520. No error was committed here, much less plain error."
710 So.2d at 1342; see also Gaddy v. State, 698 So.2d 1100, 1142 (Ala.Cr.App., 1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997); Trawick v. State, 698 So.2d 151, 161-62 (Ala.Cr.App.1995), aff'd, 698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997). The trial court properly refused Melson's written requested jury instruction number 32.
Furthermore, contrary to Melson's assertion in his brief to this court, the trial court's instructions to the jury at the penalty phase of the trial were not "silent on the issue of mercy." (Melson's brief, pp. 36, 38.) The record reflects that the trial court instructed the jury as follows:
"A mitigating circumstance is anything about the defendant or the crime itself which in fairness and mercy, should be taken into account in deciding the appropriate punishment for this defendant. Even where there is no excuse or justification for the crime, our law requires consideration of more than just the basic facts of the crime; therefore, a mitigating circumstance may stem from any of the diverse frailties of human kind.
"Mitigating facts are any facts relating to the defendant's age, character, education, environment, mentality, life and background, or any aspect of the crime itself which may be considered extenuating or reducing the defendant's moral culpability or making him less deserving of the extreme punishment of death by electrocution. You may consider as a mitigating circumstance any circumstance which tends to justify the penalty of life imprisonment without possibility of parole.
"You must consider all evidence of mitigation. Mitigation may be established by any evidence introduced by either party at either the guilt/innocent phase of this trial or this sentencing phase or both. The weight you give to a particular mitigating circumstance is a matter for your moral and factual judgment."
(R. 2137-38.) (Emphasis added.) For the reasons stated above, we find no error as to this claim.

XIII.
Melson further contends that the trial court erroneously refused his written requested penalty-phase jury instruction on "residual doubt" or "lingering doubt." (Issue VIII in Melson's brief to this court.) We find no merit to Melson's claim.
"`[C]apital defendants have no right to demand jury consideration of "residual doubts" in the sentencing phase. Franklin v. Lynaugh, 487 U.S. 164, 172-76, 108 S.Ct. 2320, 2326-28, 101 L.Ed.2d 155 (1988).'" Rieber, 663 So.2d at 995, quoting Carroll v. State, 599 So.2d 1253, 1271 (1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994).
In Myers v. State, 699 So.2d 1281 (Ala. Cr.App.1996), aff'd, 699 So.2d 1285 (Ala. 1997), cert. denied, 522 U.S. 1054, 118 S.Ct. 706, 139 L.Ed.2d 648 (1998), this court stated the following concerning jury instructions on "residual doubt":
"`"Our cases do not support the proposition that a defendant who has been *899 found to be guilty of a capital crime beyond a reasonable doubt has a constitutional right to reconsideration by the sentencing body of lingering doubts about his guilt. We have recognized that some states have adopted capital sentencing procedures that permit defendants in some cases to enjoy the benefit of doubts that linger from the guilt phase of the trial, see Lockhart v. McCree, 476 U.S. 162, 181, 106 S.Ct. 1758, 1768, 90 L.Ed.2d 137 (1986), but we have never indicated that the Eighth Amendment requires states to adopt such procedures. To the contrary, as the plurality points out, we have approved capital sentencing procedures that preclude consideration by the sentencing body of `residual doubts' about guilt. See Ante, [487 U.S. at 173 n. 6, 108 S.Ct.] at 2327, n. 6.
"`"Our decisions mandating jury consideration of mitigating circumstances provide no support for petitioner's claim because `residual doubt' about guilt is not a mitigating circumstance. We have defined mitigating circumstances as facts about the defendant's character or background, or the circumstances of the particular offense, that may call for a penalty less than death. [citations omitted]. `Residual doubt' is not a factor about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between `beyond a reasonable doubt' and `absolute certainty.'"'"
699 So.2d at 1283-84, quoting Harris v. State, 632 So.2d 503, 535 (Ala.Cr.App. 1992), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (D.Ala.1995), quoting in turn Franklin v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).
Thus, the trial court properly refused to instruct Melson's jury on "residual doubt" or "lingering doubt."

XIV.
Melson further contends that Alabama's capital sentencing statute is unconstitutional because, he argues, it does not state what weight the trial court is to give the jury's sentencing recommendation. (Issue XIII in Melson's brief to this court.) Melson did not raise this matter in the trial court; thus, our review is for plain error. Rule 45A, Ala.R.App.P.
Melson's claim was addressed and rejected by the United States Supreme Court in Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). The Court in Harris held that "the Eighth Amendment does not require the State to define the weight the sentencing judge must give to an advisory jury verdict." 513 U.S. at 512, 115 S.Ct. at 1036. The court further held:
"The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight."
513 U.S. at 515, 115 S.Ct. at 1037; see also Boyd v. State, 715 So.2d 825, 846 (Ala.Cr. App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).
Alabama's capital sentencing statute "adequately channels the trial court's discretion so as to prevent arbitrary results." Bush v. State, 695 So.2d 70, 94 (Ala.Cr. App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997) (citing Harris and rejecting claims that Alabama's statute permits a standardless override). Because Melson's claim has previously been addressed and rejected, there is no plain error as to this matter.

XV.
Melson further contends that at the sentencing phase, the trial court improperly instructed the jury that its verdicts, finding Melson guilty of the capital offense of murder during the course of a *900 robbery in the first degree, established beyond a reasonable doubt the existence of the aggravating circumstance that the capital offense was committed during the course of a robbery. See § 13A-5-49(4), Ala.Code 1975. (Issue XII in Melson's brief to this court.) Melson argues that this instruction "removed from the jury an inquiry critical to determining [his] sentence," effectively created a "presumption of death," and placed the burden of proof on the defense to show that the mitigating circumstances outweighed the aggravating circumstance. (Melson's brief, p. 54.) Initially we note that there was no objection in the trial court to the instruction now complained of on appeal; therefore, our review is for plain error. Rule 45A, Ala. R.App.P. We find no merit to Melson's contention.
Section 13A-5-50, Ala.Code 1975, contemplates that certain aggravating circumstances will be considered established for purposes of sentencing when a verdict of guilty of capital murder is returned. That section specifically provides:
"The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence. By way of illustration and not limitation, the aggravating circumstance specified in Section 13A-5-49(4) shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of Section 13A-5-40."
Section 13A-5-45(e) further provides, in pertinent part, that "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."
In rejecting a claim similar to Melson's, we stated the following in Lawhorn v. State, 581 So.2d 1159 (Ala.Cr.App.1990), aff'd, 581 So.2d 1179 (Ala.), 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991):
"Recognized by these statutes [§§ 13A-5-45(e) and 13A-5-50] and implicit in their operation is the fact that the jury, by its verdict, had already made, in essence, the `critical inquiry' of whether the aggravating circumstance, encompassed in the indictment, is present. Thus, the court's instruction did not remove, from the jury's consideration, the determination of whether the aggravating circumstance existed, for that determination had already been made by the jury.
"`The use of "aggravating circumstances," is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.'

"Lowenfield v. Phelps, 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988).
"Moreover, we have already determined, in Henderson v. State, 583 So.2d [276] at 296 [(Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992)], and in Kuenzel v. State, 577 So.2d [474] at 486 [Ala.Cr. App.1990, aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)] (Part VII), that such instruction does not impermissibly shift the burden of proof to the defendant to show why he should not be sentenced to death. See also Henry v. Wainwright, 721 F.2d 990, 996 (5th Cir. Unit B 1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984). In this regard, we note that, while the existence of an aggravating or mitigating *901 circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is not susceptible to proof by either party. Morrison v. State, 500 So.2d 36, 45 (Ala. Cr.App.1985), aff'd, 500 So.2d 57 (Ala. 1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987) (relying on Ford v. Strickland, 696 F.2d 804, 818 (11th Cir.), cert. denied, 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983))."
581 So.2d at 1170-71.
Accordingly, the trial court correctly instructed the jury that the aggravating circumstance specified in § 13A-5-49(4), that the capital offense was committed while Melson was engaged in committing or attempting to commit a robbery, had been established, as a matter of law, by virtue of the jury's guilty verdicts for murder during a robbery in the first degree or an attempt thereof. See § 13A-5-40(a)(2), Ala.Code 1975. Thus, we find no plain error here.

XVI.
Melson also contends that the trial court committed reversible error in its sentencing order when it stated, "It is the opinion of the Court that the mitigating circumstances heretofore enumerated are insufficient to outweigh the aggravating circumstance." (C. 477; R. 2192.) (Issue I in Melson's brief to this court.) See § 13A-5-47(d), Ala.Code 1975 (The determination that the sentencing court must make is "whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist."). Melson argues that the trial court's statement "improperly created and applied a presumption of death" to his case. (Melson's brief, p. 10.) Initially we note that Melson is presenting this claim for the first time on appeal; thus, our review is for plain error. Rule 45A, Ala.R.App.P.
Melson's claim has been addressed and rejected by this court in Weaver v. State, 678 So.2d 260 (Ala.Cr.App.1995), rev'd on other grounds, 678 So.2d 284 (Ala.1996); Taylor v. State, 666 So.2d 36 (Ala.Cr.App. 1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); and Fortenberry v. State, 545 So.2d 129 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990). As we stated in Weaver:
"The appellant contends that a statement made in the trial court's sentencing order was error. In the order, the trial court stated, `It is the opinion of the Court that the mitigating circumstances heretofore enumerated are insufficient to outweigh the aggravating circumstances.' (R. 121.) While this portion of the trial court's order is technically defective, this court in Fortenberry v. State, 545 So.2d 129 (Ala.Crim.App. 1988), aff'd, 545 So.2d 145 (1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990), held that this error was `not so egregious or substantial as to require a new sentencing order.' `"As long as the trial judge properly exercises his discretion and the facts indicating the death penalty are `so clear and convincing that virtually no reasonable person could differ,' a harmless error analysis can be used." Baldwin v. State, 456 So.2d 117, 126 (Ala.Cr.App. 1983), affirmed, Ex parte Baldwin, 456 So.2d 129, 140 (Ala.1984), cert. denied, 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985).' Fortenberry.

"Here, the trial court considered two aggravating circumstances and found that they were sufficient to support the sentence of death. It is clear that the trial court did not fail to consider any statutory or nonstatutory mitigating circumstances and properly engaged in a weighing and balancing process of the aggravating and mitigating circumstances in this case. We find that the facts indicating the death penalty in this *902 case are clear and convincing and that no reasonable person would differ in their opinion. The error in the trial court's sentencing order was error without injury. Fortenberry, Taylor v. State, 666 So.2d 36 [,70-71] (Ala.Crim. App.1994)."
678 So.2d at 283.
In this case, the trial court considered only one aggravating circumstance, that the murder was committed during the course of a robbery, and found that this aggravating circumstance was sufficient to support a death sentence. It is clear in this case, as in Weaver, supra, that the trial court "did not fail to consider any statutory or nonstatutory mitigating circumstances and properly engaged in a weighing and balancing process of the aggravating and mitigating circumstances in this case." Id. at 283. We have no difficulty concluding that "the facts indicating the death penalty in this case are clear and convincing and that no reasonable person would differ in their opinion." Id. Thus, the "technical" error in the trial court's sentencing order was error without injury.
We point out that during the penalty phase of the trial before the jury, the trial court correctly instructed the jury on the proper method of weighing the aggravating and mitigating circumstances. Throughout its instructions, the trial court repeatedly informed the jury that the aggravating circumstance must outweigh the mitigating circumstances in order for the jury to recommend the death penalty. (R. 2134, 2140, 2141.) "Trial judges are presumed to follow their instructions, and they are presumed to know the law and to follow it in making their decisions. Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996) (citing Ex parte Harrell, 470 So.2d 1309, 1318 (Ala.1985))." Stewart v. State, 730 So.2d 1203, 1212 (Ala.Cr.App.1997), aff'd, 730 So.2d 1246 (Ala.1999). We find that the trial court properly considered and weighed the aggravating and mitigating circumstances in sentencing Melson to death.

XVII.
Lastly, Melson contends that the cumulative effect of all the errors allegedly committed in the trial of his case violated his rights to due process and to a fair trial. (Issue XVII in Melson's brief to this court.) We do not agree. We have reviewed each and every allegation of error as well as the cumulative effect of such alleged errors and find that the cumulative effect of these alleged errors does not warrant a reversal. Moreover, the claimed errors to which Melson refers have now been determined to be without merit. Because no single instance of alleged error constituted reversible error, we will not consider the cumulative effect to be any greater. See Boyd v. State, 715 So.2d 825, 851 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).

XVIII.
In accordance with Rule 45A, Ala. R.App.P., we have examined the record for any plain error with respect to Melson's capital murder convictions and death sentence, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings, either in the guilt phase or in the sentencing phase of the trial.
We have also reviewed Melson's sentence in accordance with § 13A-5-51, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving Melson's capital murder conviction, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, *903 in determining whether death is the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Melson of the capital offenses charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended that Melson be sentenced to death by electrocution by a vote of 10-2.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Melson to life imprisonment without parole or to death as recommended by the jury. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning the aggravating circumstances enumerated in § 13A-5-49, Ala.Code 1975, the mitigating circumstances enumerated in § 13A-5-51, Ala.Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense and Melson's participation in the offense.
In its findings of fact, the trial court found the existence of one statutory aggravating circumstance: that the murders were committed while Melson was engaged in the commission of a robbery, see § 13A-5-49(4), Ala.Code 1975. The trial court found the existence of one statutory mitigating circumstance: (1) that Melson was 22 years old at the time of the offense, see § 13A-5-51(7), Ala.Code 1975. The trial court also heard testimony regarding Melson's character or record and any of the circumstances of the offense that Melson offered as a basis for sentencing him to life imprisonment without parole instead of death, see § 13A-5-52, Ala.Code 1975. In this regard, the trial court found that the following evidence presented by Melson constituted nonstatutory mitigation: (1) evidence of Melson's environment, education, life, background, family, and school history; (2) evidence that Melson loved his family and that they loved him; (3) evidence of Melson's demeanor during the trial; (4) evidence that Melson's codefendant received a sentence of life imprisonment without the possibility of parole; (5) evidence that Melson was diagnosed as having an antisocial personality disorder and was never treated for the disorder; (6) evidence that Melson's codefendant, Peraita, planned the robbery; evidence that Peraita's motive was that he needed money; and evidence that it was Peraita, not Melson, who knew the employees at Popeye's restaurant; (7) evidence that if Melson was sentenced to life imprisonment without the possibility of parole he would never be released from prison; and (8) evidence of Melson's past church attendance and involvement in church. The trial court stated in its sentencing order that it "considered all mitigating circumstances presented by the evidence and weighed each of them." (C. 477.)
The trial court's sentencing order reflects that after considering all the evidence presented, the presentence report, and the advisory verdict of the jury and after weighing the aggravating circumstance against the statutory and nonstatutory mitigating circumstances in the case, *904 the trial court found that the aggravating circumstance outweighed the statutory and nonstatutory mitigating circumstances. Accordingly, the trial court sentenced Melson to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence.
Melson was convicted of the offense of murder committed during the course of a robbery. This offense is defined by statute as a capital offense. See § 13A-5-40(a)(2), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Burgess v. State, [Ms. CR-94-0475, December 18, 1998] ___ So.2d ___ (Ala.Cr.App.1998); Clemons v. State, 720 So.2d 961 (Ala.Cr.App.1996), aff'd, 720 So.2d 985 (Ala.1998); Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Brownlee v. State, 545 So.2d 151 (Ala.Cr. App.1988), aff'd, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989); Davis v. State, 536 So.2d 110 (Ala.Cr.App. 1987), aff'd, 536 So.2d 118 (Ala.1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); Cochran v. State, 500 So.2d 1161, (Ala.Cr.App.1984), aff'd in part, rev'd in part, 500 So.2d 1179 (Ala. 1985), aff'd on return to remand, 500 So.2d 1188 (Ala.Cr.App.), aff'd, 500 So.2d 1064 (Ala.1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987).
After carefully reviewing the record of the guilt phase and the sentencing phase of Melson's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstance against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstance outweighs the mitigating circumstances, and that death is the appropriate sentence in this case. Considering Melson and the crime he committed, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
For the reasons stated above, Melson's conviction and sentence of death are affirmed.
AFFIRMED.
McMILLAN, BASCHAB, and FRY, JJ., concur.
COBB, J., recuses herself.
NOTES
[1] We affirmed Peraita's conviction for capital murder and his sentence of life imprisonment without the possibility of parole by unpublished memorandum issued September 26, 1997. See Peraita v. State, 725 So.2d 1075 (Ala.Cr.App.1997)(table).
[2] After Melson's trial, Rule 9.1(b)(2)(ii), Ala. R.Crim.P., was amended, effective December 1, 1997, to allow a capital defendant to waive the right to be present at any stage of the proceedings, except sentencing.
[3] Melson specifically complains about the admission into evidence of the tennis shoes he was wearing at the time of his arrest. The police took Melson's tennis shoes from him after his arrest, while he was being questioned at the police station.
[4] Apparently, additional information was gained as a result of the telephone call, although the record does not disclose what that information was. (R. 1239.)
[5] Melson appears also to argue in his brief to this court that Peraita's statement to the police, implicating Melson in the robbery and murders at Popeye's restaurant, was used by the trial court in its finding that there was probable cause to arrest Melson. Contrary to Melson's assertion in his brief, there is no evidence in the record that the trial court's finding of probable cause was based either solely, or in part, on Peraita's statement to the police. At the time of Melson's arrest at 1:20 a.m., Peraita had not yet given a statement to the police. Thus, we will confine our discussion concerning probable cause to the facts known to the police officers at the time of Melson's arrest.
[6] Melson does not contest the chain of custody from this point on appeal. Our review of the record reveals no improprieties concerning the chain of custody of the tennis shoes from the time Bohannon gave them to Allen to their testing by John Case at the Alabama Department of Forensic Sciences.
[7] While no specific ground was stated, it appears that Melson's objection at trial was based on the ground that the answer called for hearsay. We are assuming this because Melson's counsel raised a hearsay objection to a similar question that the prosecutor posed to Laverty on direct examination. Melson's objection to the complained-of comment at trial did not appear to be on the ground now argued on appeal, i.e., that the answer constituted an improper reference to Melson's bad character. Thus, for this reason as well, Melson has failed to properly preserve anything for appellate review; therefore, our review will be for plain error. See Leonard v. State, 551 So.2d 1143 (Ala.Cr.App.1989) (a defendant is bound by the grounds of the objection at trial and cannot change those grounds on appeal).
[8] The state points out in its brief to this court that because there was a motion pending concerning the admissibility of Melson's tennis shoes and the plaster casts made of the shoe-prints in the ditch behind Popeye's, the trial court's sustaining of the objection might have actually been based on that ground. (State's brief, p. 38.); see also R. 1454-58. However, the trial court specifically instructed the jury to disregard Ragan's answer because it was information from someone who was not present at trial and available for cross-examination. Thus, we will discuss this claim based upon the trial court's stated reason for sustaining the objection.